# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 7, 2006        Decided March 9, 2007

No. 04-7041

SHELLY PARKER, ET AL.,
APPELLANTS

v.

DISTRICT OF COLUMBIA AND
ADRIAN M. FENTY, MAYOR OF THE DISTRICT OF COLUMBIA,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 03cv00213)

———

*Alan Gura* argued the cause for appellants. With him on the briefs were *Robert A. Levy* and *Clark M. Neily, III.*

*Greg Abbott*, Attorney General, Attorney General's Office of State of Texas, *R. Ted Cruz*, Solicitor General, *Troy King*, Attorney General, Attorney General's Office of State of Alabama, *Mike Beebe*, Attorney General, Attorney General's Office of the State of Arkansas, *John W. Suthers*, Attorney General, Attorney General's Office of the State of Colorado, *Charles J. Crist, Jr.*, Attorney General, Attorney General's Office of the State of Florida, *Thurbert E. Baker*, Attorney General, Attorney General's Office of the State of Georgia,

*Michael A. Cox*, Attorney General, Attorney General's Office of the State of Michigan, *Mike Hatch*, Attorney General, Attorney General's Office of the State of Minnesota, *Jon Bruning*, Attorney General, Attorney General's Office of the State of Nebraska, *Wayne Stenehjem*, Attorney General, Attorney General's Office of the State of North Dakota, *Jim Petro*, Attorney General, Attorney General's Office of the State of Ohio, *Mark L. Shurtleff*, Attorney General, Attorney General's Office of the State of Utah, and *Patrick J. Crank*, Attorney General, Attorney General's Office of the State of Wyoming, were on the brief for *amici curiae* States of Texas, et. al. in support of appellants.

*Don B. Kates* and *Daniel D. Polsby* were on the brief for *amici curiae* Professors Frederick Bieber, et al. and organization *amici curiae* Second Amendment Foundation, et al.

*Stefan Bijan Tahmassebi* was on the brief for *amicus curiae* Congress of Racial Equality, Inc. in support of appellants seeking reversal.

*Peter J. Ferrara* was on the brief for *amicus curiae* American Civil Rights Union in support of appellants.

*Robert Dowlut* was on the brief for *amicus curiae* National Rifle Association Civil Rights Defense Fund in support of appellants seeking reversal.

*Todd S. Kim*, Solicitor General, Office of Attorney General for the District of Columbia, argued the cause for appellees. With him on the brief were *Robert J. Spagnoletti*, Attorney General, *Edward E. Schwab*, Deputy Solicitor General, and *Lutz Alexander Prager*.

*Ernest McGill*, pro se, was on the brief for *amicus curiae* Ernest McGill in support of appellees.

*Thomas F. Reilly*, Attorney General, Attorney General's Office of Commonwealth of Massachusetts, *Glenn S. Kaplan*, Assistant Attorney General, *J. Joseph Curran, Jr.*, Attorney General, Attorney General's Office of the State of Maryland, *Zulima V. Farber*, Attorney General, Attorney General's Office of the State of New Jersey, were on the brief for *amici curiae* Commonwealth of Massachusetts, et al. in support of appellees. *John Hogrogian*, Attorney, Corporation Counsel's Office of City of New York, and *Benna Ruth Solomon*, Deputy Corporation Counsel, Office of the Corporation Counsel of the City of Chicago, entered appearances.

*Andrew L. Frey*, *David M. Gossett*, *Danny Y. Chou*, Deputy City Attorney, Office of the City Attorney of the City and County of San Francisco, and *John A. Valentine*, were on the brief for *amici curiae* The Brady Center to Prevent Gun Violence, et al. in support of appellees. *Eric J. Mogilnicki* entered an appearance.

Before: HENDERSON and GRIFFITH, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

Dissenting opinion filed by *Circuit Judge* HENDERSON.

SILBERMAN, *Senior Circuit Judge*: Appellants contest the district court's dismissal of their complaint alleging that the District of Columbia's gun control laws violate their Second Amendment rights. The court held that the Second Amendment ("A well regulated Militia, being necessary to the security of a

free State, the right of the people to keep and bear Arms, shall not be infringed") does not bestow any rights on individuals except, perhaps, when an individual serves in an organized militia such as today's National Guard. We reverse.

I

Appellants, six residents of the District, challenge D.C. Code § 7-2502.02(a)(4), which generally bars the registration of handguns (with an exception for retired D.C. police officers); D.C. Code § 22-4504, which prohibits carrying a pistol without a license, insofar as that provision would prevent a registrant from moving a gun from one room to another within his or her home; and D.C. Code § 7-2507.02, requiring that all lawfully owned firearms be kept unloaded and disassembled or bound by a trigger lock or similar device. Shelly Parker, Tracey Ambeau, Tom G. Palmer, and George Lyon want to possess handguns in their respective homes for self-defense. Gillian St. Lawrence owns a registered shotgun, but wishes to keep it assembled and unhindered by a trigger lock or similar device. Finally, Dick Heller, who is a District of Columbia special police officer permitted to carry a handgun on duty as a guard at the Federal Judicial Center, wishes to possess one at his home. Heller applied for and was denied a registration certificate to own a handgun. The District, in refusing his request, explicitly relied on D.C. Code § 7-2502.02(a)(4).

Essentially, the appellants claim a right to possess what they describe as "functional firearms," by which they mean ones that could be "readily accessible to be used effectively when necessary" for self-defense in the home. They are not asserting a right to carry such weapons outside their homes. Nor are they challenging the District's authority *per se* to require the registration of firearms.

Appellants sought declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. § 1983, but the court below granted the District's motion to dismiss on the grounds that the Second Amendment, at most, protects an individual's right to "*bear* arms for service in the Militia." (The court did not refer to the word "keep" in the Second Amendment.) And, by "Militia," the court concluded the Second Amendment referred to an organized military body—such as a National Guard unit.

II

After the proceedings before the district judge, we decided *Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005). We held that plaintiffs bringing a pre-enforcement challenge to the District's gun laws had not yet suffered an injury-in-fact and, therefore, they lacked constitutional standing. Although plaintiffs expressed an intention to violate the District's gun control laws, prosecution was not imminent. We thought ourselves bound by our prior decision in *Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997), to conclude that the District's general threat to prosecute violations of its gun laws did not constitute an Article III injury. *Navegar* involved a pre-enforcement challenge by a gun manufacturer to certain provisions of the Violent Crime Control and Law Enforcement Act of 1994, which prohibited the manufacture (and possession) of semiautomatic assault weapons. We held then that the manufacturers whose products the statute listed *eo nomine* had standing to challenge the law in question because the effect of the statute was to single out individual firearms purveyors for prosecution. *Id.* at 999. However, manufacturers whose products were described solely by their characteristics had no pre-enforcement standing because the threat of prosecution was shared among the (presumably) many gun manufacturers whose products fit the statutory description, and, moreover, it was not

clear how these descriptive portions of the statute would be enforced.  *Id.* at 1001.

In *Navegar*, then, the "factor . . . most significant in our analysis" was "the statute's own identification of particular products manufactured only by appellants" because that indicated a "special priority" for preventing specified parties from engaging in a particular type of conduct.  *Id.*  Extending *Navegar*'s logic to *Seegars*, we said the *Seegars* plaintiffs were required to show that the District had singled them out for prosecution, as had been the case with at least one of the manufacturer plaintiffs in *Navegar*.  Since the *Seegars* plaintiffs could show nothing more than a general threat of prosecution by the District, we held their feared injury insufficiently imminent to support Article III standing.  396 F.3d at 1255-56.

We recognized in *Seegars* that our analysis in *Navegar* was in tension with the Supreme Court's treatment of a pre-enforcement challenge to a criminal statute that allegedly threatened constitutional rights.  *See id.* (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979)).  In *United Farm Workers*, the Supreme Court addressed the subject of pre-enforcement challenges in general terms:

> When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."

442 U.S. at 298 (quoting *Doe v. Bolton*, 410 U.S. 179, 188 (1973)).  The unqualified language of *United Farm Workers* would seem to encompass the claims raised by the *Seegars*

plaintiffs, as well as the appellants here. Appellants' assertions of Article III standing also find support in the Supreme Court's decision in *Virginia v. American Booksellers Ass'n*, 484 U.S. 383 (1988), which allowed a pre-enforcement challenge to a Virginia statute criminalizing the display of certain types of sexually explicit material for commercial purposes. In that case, the Court held it sufficient for plaintiffs to allege "an actual and well-founded fear that the law will be enforced against them," *id.* at 393, without any additional requirement that the challenged statute single out particular plaintiffs by name.[1] In both *United Farm Workers* and *American Booksellers*, the Supreme Court took a far more relaxed stance on pre-enforcement challenges than *Navegar* and *Seegars* permit. Nevertheless, unless and until this court en banc overrules these recent precedents, we must be faithful to *Seegars* just as the majority in *Seegars* was faithful to *Navegar*.

---

[1]Of course, *American Booksellers* can be distinguished from *Navegar*, *Seegars*, and the present case, on the ground that the constitutional challenge at issue there implicated the First (as opposed to the Second) Amendment. The *American Booksellers* Court was concerned that Virginia's statute might chill speech without any prosecution ever taking place, 484 U.S. at 393, thereby creating a wrong without remedy if pre-enforcement standing were denied. But in deciding whether to privilege one amendment to the U.S. Constitution over another in assessing injury-in-fact, we note the statement of our dissenting colleague in *Seegars*: "I know of no hierarchy of Bill of Rights protections that dictates different standing analysis." 396 F.3d at 1257 (Sentelle, J., dissenting). The *Seegars* majority, although it felt constrained by *Navegar* to reach a different result, tacitly agreed with Judge Sentelle's assessment that the injury-in-fact requirement should be applied uniformly over the First and Second Amendments (and presumably all other constitutionally protected rights). *Id.* at 1254.

Applying *Navegar-Seegars* to the standing question in this case, we are obliged to look for an allegation that appellants here have been singled out or uniquely targeted by the D.C. government for prosecution. No such allegation has been made; with one exception, appellants stand in a position almost identical to the *Seegars* plaintiffs. Appellants attempt to distinguish their situation from that of the *Seegars* plaintiffs by pointing to "actual" and "specific" threats, Appellants' Br. at 21, lodged against appellants by D.C. during the course of the district court litigation. But this is insufficient. None of the statements cited by appellants expresses a "special priority" for preventing *these* appellants from violating the gun laws, or a particular interest in punishing *them* for having done so. Rather, the District appears to be expressing a sentiment ubiquitous among stable governments the world over, to wit, scofflaws will be punished.

The noteworthy distinction in this case—a distinction mentioned in appellants' complaint and pressed by them on appeal—is that appellant Heller has applied for and been denied a registration certificate to own a handgun, a fact not present in *Seegars*. The denial of the gun license is significant; it constitutes an injury independent of the District's prospective enforcement of its gun laws, and an injury to which the stringent requirements for pre-enforcement standing under *Navegar* and *Seegars* would not apply. Since D.C. Code § 22-4504 (prohibition against carrying a pistol without a license) and D.C. Code § 7-2507.02 (disassembly/trigger lock requirement) would amount to further conditions on the certificate Heller desires, Heller's standing to pursue the license denial would subsume these other claims too.

This is not a new proposition. We have consistently treated a license or permit denial pursuant to a state or federal administrative scheme as an Article III injury. *See, e.g.*, *Cassell*

*v. F.C.C.*, 154 F.3d 478 (D.C. Cir. 1998) (reviewing denial of license application to operate private land mobile radio service); *Wilkett v. I.C.C.*, 710 F.2d 861 (D.C. Cir. 1983) (reviewing denial of application for expanded trucking license); *see also City of Bedford v. F.E.R.C.*, 718 F.2d 1164, 1168 (D.C. Cir. 1983) (describing wrongful denial of a preliminary hydroelectric permit as an injury warranting review).  The interests injured by an adverse licensing determination may be interests protected at common law, or they may be created by statute.  And of course, a licensing decision can also trench upon constitutionally protected interests, *see, e.g.*, *Dist. Intown Props. Ltd. P'ship v. District of Columbia*, 198 F.3d 874 (D.C. Cir. 1999) (reviewing District of Columbia's denial of a building permit under the Takings Clause); *Berger v. Bd. of Psychologist Exam'rs*, 521 F.2d 1056 (D.C. Cir. 1975) (reviewing District of Columbia's denial of a license to practice psychology under the Due Process Clause), which will also give rise to Article III injury.

At oral argument, counsel for the District maintained that we should not view this as a licensing case for standing purposes because D.C.'s firearm registration system amounts to a complete prohibition on handgun ownership.  The District argues that we must analyze appellants' standing exclusively under our pre-enforcement precedents, *Seegars* and *Navegar*.  We disagree on both counts.  The District does not *completely* prohibit handgun registration. *See* D.C. Code § 7-2502.02(a)(4) (allowing certificates for pistols already registered in the District prior to 1976); D.C. Code § 7-2502.02(b) (excluding retired police officers of the Metropolitan Police Department from the ban on pistol registration).  Had Heller been a retired police officer, presumably the District would have granted him a registration certificate.  The same would be true if Heller had attempted to register a long gun, as opposed to a handgun.  In any event, Heller has invoked his rights under the Second Amendment to challenge the statutory classifications used to bar

his ownership of a handgun under D.C. law, and the formal process of application and denial, however routine, makes the injury to Heller's alleged constitutional interest concrete and particular. He is not asserting that his injury is only a threatened prosecution, nor is he claiming only a general right to handgun ownership; he is asserting a right to a registration certificate, the denial of which is his distinct injury.

We note that the Ninth Circuit has recently dealt with a Second Amendment claim by first extensively analyzing that provision, determining that it does not provide an individual right, and then, and only then, concluding that the plaintiff lacked standing to challenge a California statute restricting the possession, use, and transfer of assault weapons. *See Silveira v. Lockyer*, 312 F.3d 1052, 1066-67 & n.18 (9th Cir. 2003). We think such an approach is doctrinally quite unsound. The Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim. *See Warth v. Seldin*, 422 U.S. 490, 501-02 (1975) (assuming factual allegations and legal theory of complaint for purposes of standing analysis). We have repeatedly recognized that proposition. *See Waukesha v. E.P.A.*, 320 F.3d 228, 235 (D.C. Cir. 2003); *Am. Fed'n of Gov't Employees, AFL-CIO v. Pierce*, 697 F.2d 303, 305 (D.C. Cir. 1982). "Indeed, in reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *Waukesha*, 320 F.3d at 235 (citing *Warth*, 422 U.S. at 502). This is no less true when, as here, the merits involve the scope of a constitutional protection.

Still, we have not always been so clear on this point. Although we recognized in *Claybrook v. Slater*, 111 F.3d 904 (D.C. Cir. 1997), that it was not necessary for a plaintiff to

demonstrate that he or she would prevail on the merits in order to have Article III standing, the rest of our discussion seems somewhat in tension with that proposition. We did recognize that in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), when the Supreme Court used the phrase "legally protected interest" as an element of injury-in-fact, it made clear it was referring only to a "cognizable interest." *Claybrook*, 111 F.3d at 906-07. The Court in *Lujan* concluded that plaintiffs had a "cognizable interest" in observing animal species without considering whether the plaintiffs had a legal *right* to do so. *Id.* (citing *Lujan*, 504 U.S. at 562-63). We think it plain the *Lujan* Court did not mean to suggest a return to the old "legal right" theory of standing rejected in *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153-54 (1970), because it cited *Warth*, *inter alia*, as precedent for the sentence which included the phrase "legally protected interest." *Lujan*, 504 U.S. at 560. Rather, the cognizable interest to which the Court referred would distinguish, to pick one example, a desire to observe certain aspects of the environment from a generalized wish to see the Constitution and laws obeyed. Indeed, in *Judicial Watch, Inc. v. United States Senate*, 432 F.3d 359 (D.C. Cir. 2005), Judge Williams wrote an extensive concurring opinion (not inconsistent with the majority opinion) in which he persuasively explains that the term "legally protected interest," as used in *Lujan*, could not have been intended to deviate from *Warth*'s general proposition that we assume the merits when evaluating standing. *Id.* at 363-66.

In *Claybrook*, we went on to say, quite inconsistently, that "if the plaintiff's claim has no foundation in law, he has no legally protected interest and thus no standing to sue." *Claybrook*, 111 F.3d at 907. We concluded that plaintiff lacked standing, however, because the government agency in that case had unfettered discretion to take the action it did, and therefore there was "no law to apply." *Id.* at 908. Thus the decision in

*Claybrook* was actually based on a separate jurisdictional ground—reviewability under the Administrative Procedure Act—and federal courts may choose any ground to deny jurisdiction, e.g., Article III standing, prudential standing, or subject matter jurisdiction. *See Judicial Watch*, 432 F.3d at 366 (Williams, J., concurring) (noting that *Claybrook* is hard to classify as a standing opinion). There is no hierarchy which obliges a court to decide Article III standing issues before other jurisdictional questions. *In re Papandreou*, 139 F.3d 247, 255-56 (D.C. Cir. 1998). Therefore, we do not read *Claybrook* to stand for the proposition, *contra Warth*, that we must evaluate the existence *vel non* of appellants' Second Amendment claim as a standing question.[2]

In sum, we conclude that Heller has standing to raise his § 1983 challenge to specific provisions of the District's gun control laws.

### III

As we noted, the Second Amendment provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed.

U.S. CONST. amend. II.

---

[2]Admittedly, in *Taylor v. F.D.I.C.*, 132 F.3d 753, 767 (D.C. Cir. 1997), we observed that the causation requirement of standing could coincide with the causal element in a cause of action. *But cf. id.* at 770 (Rogers, J., concurring). Whether that was correct or not, we concluded that even in that unique situation, not present here, we had discretion to decide the case on the merits or on standing grounds. *Id.* at 767-68.

The provision's second comma divides the Amendment into two clauses; the first is prefatory, and the second operative. Appellants' argument is focused on their reading of the Second Amendment's operative clause. According to appellants, the Amendment's language flat out guarantees an individual right "to keep and bear Arms." Appellants concede that the prefatory clause expresses a civic purpose, but argue that this purpose, while it may inform the meaning of an ambiguous term like "Arms," does not qualify the right guaranteed by the operative portion of the Amendment.

The District of Columbia argues that the prefatory clause declares the Amendment's only purpose—to shield the state militias from federal encroachment—and that the operative clause, even when read in isolation, speaks solely to military affairs and guarantees a civic, rather than an individual, right. In other words, according to the District, the operative clause is not just limited by the prefatory clause, but instead both clauses share an explicitly civic character. The District claims that the Second Amendment "protects private possession of weapons *only* in connection with performance of civic duties as part of a well-regulated citizens militia organized for the security of a free state." Individuals may be able to enforce the Second Amendment right, but only if the law in question "will impair their participation in common defense and law enforcement when called to serve in the militia." But because the District reads "a well regulated Militia" to signify only the organized militias of the founding era—institutions that the District implicitly argues are no longer in existence today—invocation of the Second Amendment right is conditioned upon service in a defunct institution. Tellingly, we think, the District did not suggest what sort of law, if any, would violate the Second Amendment today—in fact, at oral argument, appellees' counsel asserted that it would be constitutional for the District to ban all

firearms outright. In short, we take the District's position to be that the Second Amendment is a dead letter.

We are told by the District that the Second Amendment was written in response to fears that the new federal government would disarm the state militias by preventing men from bearing arms while in actual militia service, or by preventing them from keeping arms at home in preparation for such service. Thus the Amendment should be understood to check federal power to regulate firearms only when federal legislation was directed at the abolition of state militias, because the Amendment's *exclusive* concern was the preservation of those entities. At first blush, it seems passing strange that the able lawyers and statesmen in the First Congress (including James Madison) would have expressed a sole concern for state militias with the language of the Second Amendment. Surely there was a more direct locution, such as "Congress shall make no law disarming the state militias" or "States have a right to a well-regulated militia."

The District's argument—as strained as it seems to us—is hardly an isolated view. In the Second Amendment debate, there are two camps. On one side are the collective right theorists who argue that the Amendment protects only a right of the various state governments to preserve and arm their militias. So understood, the right amounts to an expression of militant federalism, prohibiting the federal government from denuding the states of their armed fighting forces. On the other side of the debate are those who argue that the Second Amendment protects a right of individuals to possess arms for private use. To these individual right theorists, the Amendment guarantees personal liberty analogous to the First Amendment's protection of free speech, or the Fourth Amendment's right to be free from unreasonable searches and seizures. However, some

entrepreneurial scholars purport to occupy a middle ground between the individual and collective right models.

The most prominent in-between theory developed by academics has been named the "sophisticated collective right" model.[3] The sophisticated collective right label describes several variations on the collective right theme. All versions of this model share two traits: They (1) acknowledge individuals could, theoretically, raise Second Amendment claims against the federal government, but (2) define the Second Amendment as a purely civic provision that offers no protection for the private use and ownership of arms.

The District advances this sort of theory and suggests that the ability of individuals to raise Second Amendment claims serves to distinguish it from the pure collective right model. But when seen in terms of its practical consequences, the fact that individuals have standing to invoke the Second Amendment is, in our view, a distinction without a difference. *But cf. United States v. Emerson*, 270 F.3d 203, 218-21 (5th Cir. 2001) (treating the sophisticated collective right model as distinct from the collective right theory). Both the collective and sophisticated collective theories assert that the Second Amendment was written for the exclusive purpose of preserving state militias, and both theories deny that individuals *qua* individuals can avail themselves of the Second Amendment today. The latter point is true either because, as the District appears to argue, the "Militia" is no longer in existence, or, as

---

[3]*See United States v. Parker*, 362 F.3d 1279, 1284 (10th Cir. 2004); *United States v. Price*, 328 F.3d 958, 961 (7th Cir. 2003); *United States v. Emerson*, 270 F.3d 203, 219 (5th Cir. 2001); *Seegars v. Aschcroft*, 297 F. Supp. 2d 201, 218 (D.D.C. 2004); *see also* Robert J. Cottrol & Raymond T. Diamond, *The Fifth Auxiliary Right*, 104 YALE L.J. 995, 1003-04 (1995).

others argue, because the militia's modern analogue, the National Guard, is fully equipped by the federal government, creating no need for individual ownership of firearms. It appears to us that for all its nuance, the sophisticated collective right model amounts to the old collective right theory giving a tip of the hat to the problematic (because ostensibly individual) text of the Second Amendment.

The lower courts are divided between these competing interpretations. Federal appellate courts have largely adopted the collective right model.[4] Only the Fifth Circuit has interpreted the Second Amendment to protect an individual right.[5] State appellate courts, whose interpretations of the U.S.

---

[4]*See Silveira*, 312 F.3d at 1092; *Gillespie v. City of Indianapolis*, 185 F.3d 693, 710 (7th Cir. 1999); *United States v. Wright*, 117 F.3d 1265, 1273-74 (11th Cir. 1997); *United States v. Rybar*, 103 F.3d 273, 286 (3d Cir. 1996); *Love v. Pepersack*, 47 F.3d 120, 122 (4th Cir. 1995); *United States v. Hale*, 978 F.2d 1016, 1019-20 (8th Cir. 1992); *United States v. Oakes*, 564 F.2d 384, 387 (10th Cir. 1977); *United States v. Warin*, 530 F.2d 103, 106 (6th Cir. 1976); *Cases v. United States*, 131 F.2d 916, 921-23 (1st Cir. 1942).

The District cites a decision in the Second Circuit, *United States v. Toner*, 728 F.2d 115 (2d Cir. 1984), as holding that the Second Amendment protects only a right related to "civic purposes." The District's reliance on this case is plainly wrong. In *Toner*, the court stated only that the Second Amendment right was not "fundamental." *Id.* at 128. The opinion in no way addressed the question whether the Second Amendment requires that use and possession of a weapon be for civic purposes. We are not aware of any Second Circuit decision that directly addresses the collective versus individual nature of the Second Amendment right. *See Silveira*, 312 F.3d at 1063 n.11 (noting that only the Second and D.C. Circuits had yet to decide nature of Second Amendment right).

[5]*Emerson*, 270 F.3d at 264-65.

Constitution are no less authoritative than those of our sister circuits, offer a more balanced picture.[6]  And the United States Department of Justice has recently adopted the individual right model.  *See* Op. Off. of Legal Counsel, "Whether the Second Amendment Secures an Individual Right" (2004) *available at* http://www.usdoj.gov/olc/secondamendment2.pdf; *see also* Memorandum from John Ashcroft, Attorney General, to All United States' Attorneys (Nov. 9, 2001), *reprinted in* Br. for the United States in Opposition at 26, *Emerson*, 536 U.S. 907 (No. 01-8780).  The great legal treatises of the nineteenth century support the individual right interpretation, s*ee Silveira v. Lockyer*, 328 F.3d 567, 583-85 (9th Cir. 2003) (Kleinfeld, J., dissenting from denial of rehearing en banc); *Emerson*, 270 F.3d

---

[6]Of the state appellate courts that have examined the question, at least seven have held that the Second Amendment protects an individual right, *see Hilberg v. F.W. Woolworth Co.*, 761 P.2d 236, 240 (Colo. Ct. App. 1988); *Brewer v. Commonwealth*, 206 S.W.3d 343, 347 & n.5 (Ky. 2006); *State v. Blanchard*, 776 So. 2d 1165, 1168 (La. 2001); *State v. Nickerson*, 247 P.2d 188, 192 (Mont. 1952); *Stillwell v. Stillwell*, 2001 WL 862620, at *4 (Tenn. Ct. App. July 30, 2001); *State v. Anderson*, 2000 WL 122218, at *7 n.3 (Tenn. Crim. App. Jan. 26, 2000); *State v. Williams*, 148 P.3d 993, 998 (Wash. 2006); *Rohrbaugh v. State*, 607 S.E.2d 404, 412 (W. Va. 2004), whereas at least ten state appellate courts (including the District of Columbia) have endorsed the collective right position, *see United States v. Sandidge*, 520 A.2d 1057, 1058 (D.C. 1987); *Commonwealth v. Davis*, 343 N.E.2d 847, 850 (Mass. 1976); *In re Atkinson*, 291 N.W.2d 396, 398 n.1 (Minn. 1980); *Harris v. State*, 432 P.2d 929, 930 (Nev. 1967); *Burton v. Sills*, 248 A.2d 521, 526 (N.J. 1968); *In re Cassidy*, 51 N.Y.S.2d 202, 205 (N.Y. App. Div. 1944); *State v. Fennell*, 382 S.E.2d 231, 232 (N.C. Ct. App. 1989); *Mosher v. City of Dayton*, 358 N.E.2d 540, 543 (Ohio 1976); *Master v. State*, 653 S.W.2d 944, 945 (Tex. App. 1983); *State v. Vlacil*, 645 P.2d 677, 679 (Utah 1982); *see also Kalodimos v. Village of Morton Grove*, 470 N.E.2d 266, 269 (Ill. 1984) (stating in dicta that Second Amendment protects collective right).

at 236, 255-59, as does Professor Laurence Tribe's leading treatise on constitutional law.[7]  Because we have no direct precedent—either in this court or the Supreme Court—that provides us with a square holding on the question, we turn first to the text of the Amendment.

## A

We start by considering the competing claims about the meaning of the Second Amendment's operative clause:  "the right of the people to keep and bear Arms shall not be infringed."  Appellants contend that "the right of the people" clearly contemplates an individual right and that "keep and bear Arms" necessarily implies private use and ownership. The District's primary argument is that "keep and bear Arms" is best read in a military sense, and, as a consequence, the entire operative clause should be understood as granting only a collective right.  The District also argues that "the right of the people" is ambiguous as to whether the right protects civic or private ownership and use of weapons.

In determining whether the Second Amendment's guarantee is an individual one, or some sort of collective right, the most important word is the one the drafters chose to describe the holders of the right—"the people."  That term is found in the First, Second, Fourth, Ninth, and Tenth Amendments.  It has never been doubted that these provisions were designed to protect the interests of *individuals* against government intrusion, interference, or usurpation.  We also note that the Tenth

---

[7]*See* 1 LAURENCE TRIBE, AMERICAN CONSTITUTIONAL LAW 902 & n.221 (3d ed. 2000). Professor Tribe was not always of this view. *See* Sanford Levinson, *The Embarrassing Second Amendment*, 99 YALE L.J. 637, 640 (1989) (critiquing Tribe's earlier collective right position).

Amendment—"The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people"—indicates that the authors of the Bill of Rights were perfectly capable of distinguishing between "the people," on the one hand, and "the states," on the other. The natural reading of "the right of the people" in the Second Amendment would accord with usage elsewhere in the Bill of Rights.

The District's argument, on the other hand, asks us to read "the people" to mean some subset of individuals such as "the organized militia" or "the people who are engaged in militia service," or perhaps not any individuals at all—e.g., "the states." *See Emerson*, 270 F.3d at 227. These strained interpretations of "the people" simply cannot be squared with the uniform construction of our other Bill of Rights provisions. Indeed, the Supreme Court has recently endorsed a uniform reading of "the people" across the Bill of Rights. In *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), the Court looked specifically at the Constitution and Bill of Rights' use of "people" in the course of holding that the Fourth Amendment did not protect the rights of non-citizens on foreign soil:

> "[T]he people" seems to have been a term of art employed in select parts of the Constitution. The Preamble declares that the Constitution is ordained and established by "the People of the United States." The Second Amendment protects "the right of the people to keep and bear Arms," and the Ninth and Tenth Amendments provide that certain rights and powers are retained by and reserved to "the people." *See also* U.S. CONST., amdt. 1; Art. I, § 2, cl. 1. While this textual exegesis is by no means conclusive, it suggests that "the people" protected by the Fourth Amendment, and by the First and Second Amendments, and to whom

> rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

*Id.* at 265. It seems unlikely that the Supreme Court would have lumped these provisions together without comment if it were of the view that the Second Amendment protects only a collective right. The Court's discussion certainly indicates—if it does not definitively determine—that we should not regard "the people" in the Second Amendment as somehow restricted to a small subset of "the people" meriting protection under the other Amendments' use of that same term.

In sum, the phrase "the right of the people," when read intratextually and in light of Supreme Court precedent, leads us to conclude that the right in question is individual. This proposition is true even though "the people" at the time of the founding was not as inclusive a concept as "the people" today. *See* Robert E. Shallope, *To Keep and Bear Arms in the Early Republic*, 16 CONST. COMMENT. 269, 280-81 (1999). To the extent that non-whites, women, and the propertyless were excluded from the protections afforded to "the people," the Equal Protection Clause of the Fourteenth Amendment is understood to have corrected that initial constitutional shortcoming.

The wording of the operative clause also indicates that the right to keep and bear arms was not created by government, but rather preserved by it. *See* Thomas B. McAffee & Michael J. Quinlan, *Bringing Forward the Right to Keep and Bear Arms: Do Text, History, or Precedent Stand in the Way?*, 75 N.C. L. REV. 781, 890 (1997). Hence, the Amendment acknowledges "*the* right . . . to keep and bear Arms," a right that pre-existed

the Constitution like "*the* freedom of speech." Because the right to arms existed prior to the formation of the new government, *see Robertson v. Baldwin*, 165 U.S. 275, 280 (1897) (describing the origin of the Bill of Rights in English law), the Second Amendment only guarantees that the right "shall not be infringed." Thomas Cooley, in his influential treatise, observed that the Second Amendment had its origins in the struggle with the Stuart monarchs in late-seventeenth-century England. *See* THOMAS M. COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 270-72 (Rothman & Co. 1981) (1880).[8]

---

[8]Indeed, England's Bill of Rights of 1689 guaranteed "[t]hat the Subjects, which are Protestants, may have Arms for their Defence, suitable to their conditions, as allowed by law." 1 W. & M., Sess. 2, c. 2. Here too, however, the right was not newly created, but rather recognized as part of the common law tradition. The ancient origin of the right in England was affirmed almost a century later, in the aftermath of the anti-Catholic Gordon riots of 1780, when the Recorder of London, who was the foremost legal advisor to the city as well as the chief judge of the Old Bailey, gave the following opinion on the legality of private organizations armed for defense against rioters:

The right of His majesty's Protestant subjects, to have arms for their own defence, and to use them for lawful purposes, is most clear and undeniable. It seems, indeed, to be considered, by the ancient laws of the Kingdom, not only as a *right*, but as a *duty*; for all the subjects of the realm, who are able to bear arms, are bound to be ready, at all times, to assist the sheriff, and other civil magistrates, in the execution of the laws and the preservation of the public peace. And that right which every Protestant most unquestionably possesses, individually, may, and in many cases must, be exercised collectively, is likewise a point which I conceive to be most clearly established by the authority of judicial decisions and ancient acts of parliament, as well as by reason and common sense.

To determine what interests this pre-existing right protected, we look to the lawful, private purposes for which people of the time owned and used arms. The correspondence and political dialogue of the founding era indicate that arms were kept for lawful use in self-defense and hunting. *See Emerson*, 270 F.3d at 251-55 (collecting historical materials); Robert E. Shallope, *The Ideological Origins of the Second Amendment*, 69 J. AM. HIST. 599, 602-14 (1982); *see also* PA. CONST. sec. 43 (Sept. 28, 1776) ("The inhabitants of this state shall have liberty to fowl and hunt in seasonable times on the lands they hold, and on all other lands therein not enclosed . . . .").

The pre-existing right to keep and bear arms was premised on the commonplace assumption that individuals would use them for these private purposes, in addition to whatever militia service they would be obligated to perform for the state. The premise that private arms would be used for self-defense accords with Blackstone's observation, which had influenced thinking in the American colonies, that the people's right to arms was auxiliary to the natural right of self-preservation. *See* WILLIAM BLACKSTONE, 1 COMMENTARIES *136, *139; *see also Silveira*, 328 F.3d at 583-85 (Kleinfeld, J.); *Kasler v. Lockyer*, 2 P.3d 581, 602 (Cal. 2000) (Brown, J., concurring). The right of self-preservation, in turn, was understood as the right to defend oneself against attacks by lawless individuals, or, if absolutely necessary, to resist and throw off a tyrannical government. *See Silveira*, 328 F.3d at 583-85 (Kleinfeld, J.); *see also id.* at 569-

---

Opinion on the Legality of the London Military Foot Association, *reprinted in* WILLIAM BLIZZARD, DESULTORY REFLECTIONS ON POLICE 59-60 (1785). For further examination of the Second Amendment's English origins, see generally JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS (1994).

70 (Kozinski, J., dissenting from the denial of rehearing en banc); *Kasler*, 2 P.3d at 605 (Brown, J., concurring).[9]

When we look at the Bill of Rights as a whole, the setting of the Second Amendment reinforces its individual nature. The Bill of Rights was almost entirely a declaration of individual rights, and the Second Amendment's inclusion therein strongly indicates that it, too, was intended to protect personal liberty. The collective right advocates ask us to imagine that the First Congress situated a *sui generis* states' right among a catalogue

---

[9]The importance of the private right of self-defense is hardly surprising when one remembers that most Americans lacked a professional police force until the middle of the nineteenth century, s*ee* Levinson, *supra*, at 646 & n.46, and that many Americans lived in backcountry such as the Northwest Territory.

With respect to the right to defend oneself against tyranny and oppression, some have argued that the Second Amendment is utterly irrelevant because the arms it protects, even if commonly owned, would be of no use when opposed to the arsenal of the modern state. But as Judge Kozinski has noted, incidents such as the Warsaw ghetto uprising of 1943 provide rather dramatic evidence to the contrary. *See Silveira*, 328 F.3d at 569-70 (dissenting from the denial of rehearing en banc). The deterrent effect of a well-armed populace is surely more important than the probability of overall success in a full-out armed conflict. Thus could Madison write to the people of New York in 1788:

> Notwithstanding the military establishments in the several kingdoms of Europe, which are carried as far as public resources will bear, the governments are afraid to trust the people with arms. And it is not certain that with this aid alone they would not be able to shake off their yokes.

THE FEDERALIST NO. 46, at 299-300 (James Madison) (Clinton Rossiter ed., 1961).

of cherished individual liberties without comment. We believe the canon of construction known as *noscitur a sociis* applies here. Just as we would read an ambiguous statutory term in light of its context, we should read any supposed ambiguities in the Second Amendment in light of *its* context. Every other provision of the Bill of Rights, excepting the Tenth, which speaks explicitly about the allocation of governmental power, protects rights enjoyed by citizens in their individual capacity. The Second Amendment would be an inexplicable aberration if it were not read to protect individual rights as well.

The District insists that the phrase "keep and bear Arms" should be read as purely military language, and thus indicative of a civic, rather than private, guarantee. The term "bear Arms" is obviously susceptible to a military construction. But it is not accurate to construe it exclusively so. First, the word "bear" in this context is simply a more formal synonym for "carry," i.e., "Beware of Greeks bearing gifts." The *Oxford English Dictionary* and the original *Webster's* list the primary meaning of "bear" as "to support" or "to carry." *See Silveira*, 328 F.3d at 573 (Kleinfeld, J.). Dr. Johnson's *Dictionary*—which the Supreme Court often relies upon to ascertain the founding-era understanding of text, *see, e.g.*, *Eldred v. Ashcroft*, 537 U.S. 186, 199 (2003)—is in accord. The first three definitions for "bear" are "to carry as a burden," "to convey or carry," and "to carry as a mark of authority." *See* JOHNSON'S AND WALKER'S ENGLISH DICTIONARIES COMBINED 126 (J.E. Worcester ed., 1830) [hereinafter Johnson].

Historical usage, as gleaned from the *O.E.D.* and *Webster's*, supports the notion that "bear arms" was sometimes used as an idiom signifying the use of weaponry in conjunction with military service. However, these sources also confirm that the idiomatic usage was not absolute. *Silveira*, 328 F.3d at 573 (Kleinfeld, J.); *Emerson*, 270 F.3d at 229-32. Just as it is clear

that the phrase "to bear arms" was in common use as a byword for soldiering in the founding era, *see, e.g.*, Gary Wills, *To Keep and Bear Arms*, N.Y. REV. OF BOOKS, Sept. 21, 1995, at 62-73, it is equally evident from a survey of late eighteenth- and early nineteenth-century state constitutional provisions that the public understanding of "bear Arms" also encompassed the carrying of arms for private purposes such as self-defense. *See Emerson*, 270 F.3d at 230 n.29 (collecting state constitutional provisions referring to the people's right to "bear arms in defence of themselves and the State" among other formulations). Thus, it would hardly have been unusual for a writer at the time (or now) to have said that, after an attack on a house by thieves, the men set out to find them "bearing arms."

The District relies heavily on the use of "bearing arms" in a conscientious objector clause that formed part of Madison's initial draft of the Second Amendment. The purpose of this clause, which was later dropped from the Amendment's text, was to excuse those "religiously scrupulous of bearing arms" from being forced "to render military service in person." THE COMPLETE BILL OF RIGHTS 169 (Neil H. Cogan ed. 1997). The District argues that the conscientious objector clause thus equates "bearing arms" with military service. The Quakers, Mennonites, and other pacifist sects that were to benefit by the conscientious objector clause had scruples against soldiering, but not necessarily hunting, which, like soldiering, involved the *carrying* of arms. And if "bearing arms" only meant "carrying arms," it is argued, the phrase would not have been used in the conscientious objector clause because Quakers were not religiously scrupulous of carrying arms generally; it was carrying arms *for militant purposes* that the Friends truly abhorred (although many Quakers certainly frowned on hunting as the wanton infliction of cruelty upon animals). *See* THOMAS CLARKSON, A PORTRAITURE OF QUAKERISM, VOL. I. That Madison's conscientious objector clause appears to use "bearing

arms" in a strictly military sense does at least suggest that "bear Arms" in the Second Amendment's operative clause includes the carrying of arms for military purposes. However, there are too many instances of "bear arms" indicating private use to conclude that the drafters intended only a military sense.

In addition to the state constitutional provisions collected in *Emerson*, there is the following statement in the report issued by the dissenting delegates at the Pennsylvania ratification convention:

> That the people have a right to bear arms for the defence of themselves and their own state, or the United States, or for the purpose of killing game . . . .

THE ADDRESS AND REASONS OF DISSENT OF THE MINORITY OF THE CONVENTION OF PENNSYLVANIA TO THEIR CONSTITUENTS, *reprinted in* 3 THE COMPLETE ANTI-FEDERALIST 145, 151 (Herbert J. Storing ed., 1981). These dissenting Antifederalists, writing in December 1787, were clearly using "bear arms" to include uses of weaponry outside the militia setting—e.g., one may "bear arms . . . for the purpose of killing game."[10]

---

[10]To be sure, collective right theorists have correctly observed that the Pennsylvania dissenters were not speaking for anyone but themselves—that is, they lost in their attempt to defeat ratification of the Constitution, and lacked the clout to have their suggested amendments sent to the First Congress, unlike the Antifederalist delegates in other state conventions. *See* Jack N. Rakove, *The Second Amendment: The Highest Stage of Originalism*, 76 CHI.-KENT L. REV. 103, 134-35 (2000). But that the dissenting delegates were political losers does not undercut their status as competent users of late-eighteenth-century English.

We also note that at least three current members (and one former member) of the Supreme Court have read "bear Arms" in the Second Amendment to have meaning beyond mere soldiering: "Surely a most familiar meaning [of 'carries a firearm'] is, as the Constitution's Second Amendment ('keep and *bear* Arms') and Black's Law Dictionary . . . indicate: 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting, joined by Rehnquist, C.J., Scalia, J., and Souter, J.) (emphasis in original). Based on the foregoing, we think the operative clause includes a private meaning for "bear Arms."

In contrast to the collective right theorists' extensive efforts to tease out the meaning of "bear," the conjoined, *preceding* verb "keep" has been almost entirely neglected. In that tradition, the District offers a cursory and largely dismissive analysis of the verb. The District appears to claim that "keep and bear" is a unitary term and that the individual word "keep" should be given no independent significance. This suggestion is somewhat risible in light of the District's admonishment, earlier in its brief, that when interpreting constitutional text "every word must have its due force, and appropriate meaning; . . . no word was unnecessarily used or needlessly added." Appellees' Br. at 23 (quoting *Holmes v. Jennison*, 39 U.S. (14 Pet.) 540, 570-71 (1840)). Even if "keep" and "bear" are not read as a unitary term, we are told, the meaning of "keep" cannot be broader than "bear" because the Second Amendment only protects the use of arms in the course of militia service. *Id.* at 26-27. But this proposition assumes its conclusion, and we do not take it seriously.

One authority cited by the District has attempted to equate "keep" with "keep up," a term that had been used in phrases such as "keep up a standing army" or, as in the Articles of Confederation, "every state shall keep up a well regulated and disciplined militia . . . ." *See* Wills, *supra*, at 66. The argument that "keep" as used in "the right of the people to keep . . . Arms" shares a military meaning with "keep up" as used in "every state shall keep *up* a well regulated militia" mocks usage, syntax, and common sense. Such outlandish views are likely advanced because the plain meaning of "keep" strikes a mortal blow to the collective right theory. Turning again to Dr. Johnson's *Dictionary*, we see that the first three definitions of "keep" are "to retain; not to lose," "to have in custody," "to preserve; not to let go." Johnson, *supra*, at 540. We think "keep" is a straightforward term that implies ownership or possession of a functioning weapon by an individual for private use. *Emerson*, 270 F.3d at 231 & n.31; *accord Silveira*, 328 F.3d at 573-74 (Kleinfeld, J.). The term "bear arms," when viewed in isolation, might be thought ambiguous; it could have a military cast. But since "the people" and "keep" have obvious individual and private meanings, we think those words resolve any supposed ambiguity in the term "bear arms."

\* \* \*

The parties generally agree that the prefatory clause, to which we now turn, declares the Second Amendment's civic purpose—i.e., insuring the continuance of the militia system—and only disagree over whether that purpose was exclusive. The parties do attribute dramatically different meanings to "a well regulated Militia." Appellants argue that the militia referenced in the Second Amendment's prefatory clause was "practically synonymous" with "the people" referenced in the operative clause. The District advances a much more limited definition. According to the District, the

militia was a body of adult men regulated and organized by state law as a civilian fighting force. The crucial distinction between the parties' views then goes to the nature of the militia: Appellants claim no organization was required, whereas the District claims a militia did not exist unless it was subject to state discipline and leadership. As we have already noted, the District claims that "the Framers' militia has faded into insignificance."

The parties draw on *United States v. Miller*, 307 U.S. 174 (1939), to support their differing definitions. *Miller*, a rare Second Amendment precedent in the Supreme Court, the holding of which we discuss below, described the militia in the following terms:

> The Militia which the States were expected to maintain and train is set in contrast with Troops which they were forbidden to keep without the consent of Congress. The sentiment of the time strongly disfavored standing armies; the common view was that adequate defense of country and laws could be secured through the Militia—civilians primarily, soldiers on occasion.

> The signification attributed to the term Militia appears from the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators. These show plainly enough that the Militia comprised all males physically capable of acting in concert for the common defense. "A body of citizens enrolled for military discipline." And further, that ordinarily when called for service these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.

*Id.* at 178-79.

The District claims that *Miller*'s historical account of the "Militia" supports its position. Yet according to *Miller*, the militia included "*all males physically capable of acting in concert for the common defence*" who were "*enrolled for military discipline*." And *Miller*'s expansive definition of the militia—qualitatively different from the District's concept—is in accord with the second Militia Act of 1792, passed by the Second Congress.[11] Act of May 8, 1792, ch. XXXIII, 1 Stat. 271. Of course, many of the members of the Second Congress were also members of the First, which had drafted the Bill of Rights. But more importantly, they were conversant with the common understanding of both the First Congress and the ratifying state legislatures as to what was meant by "Militia" in the Second Amendment. The second Militia Act placed specific and extensive requirements on the citizens who were to constitute the militia:

> Be it enacted . . . [t]hat each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein after excepted) shall severally and respectively be *enrolled* in the militia, by the captain or

---

[11]The second Militia Act was passed on May 8, 1792. On May 2, 1792, Congress had enacted a Militia Act "providing for the authority of the President to call out the Militia." Act of May 2, 1792, ch. XXVIII, 1 Stat. 264. The first Militia Act gave the President power to call forth the Militia in cases of invasion by a foreign nation or Indian tribe, and also in cases of internal rebellion. If the militia of the state wherein the rebellion was taking place either was unable to suppress it or refused to be called up, the first Militia Act gave the President authority to use militia from other states.

commanding officer of the company, within whose bounds such citizen shall reside, and that within twelve months after the passing of this Act. And . . . every such captain or commanding officer of a company . . . shall without delay notify such citizen of the said enrollment . . . . That every citizen, so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch, with a box therein, to contain not less than twenty four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball: or with a good rifle, knapsack, shot-pouch, and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear so armed, accoutred and provided, when called out to exercise, or into service.

*Id.* (emphasis added).[12]

The reader will note that the Act's first requirement is that the "free able-bodied white male" population between eighteen and forty-five *enroll* in the militia. And enrollment was quite distinct from the various other regulations prescribed by Congress, which included the type of weaponry members of the militia must own. Becoming "enrolled" in the militia appears to

---

[12]Congress enacted this provision pursuant to its Article I, Section 8 powers over the militia: "The Congress shall have the power . . . [t]o provide for organizing, arming, and disciplining, the militia, and for governing such part of them as may be employed in the service of the United States, reserving to the states respectively, the appointment of the officers, and the authority of training the militia according to the discipline prescribed by Congress . . . ." U.S. CONST., art. I., sec. 8.

have involved providing one's name and whereabouts to a local militia officer—somewhat analogous to our nation's current practice of requiring young men to register under the Selective Service Act. *Silveira*, 328 F.3d at 578 (Kleinfeld, J.). Thus when read in light of the second Militia Act, *Miller* defines the militia as having only two primary characteristics: It was all free, white, able-bodied men of a certain age who had given their names to the local militia officers as eligible for militia service. Contrary to the District's view, there was no organizational condition precedent to the existence of the "Militia." Congress went on in the second Militia Act to prescribe a number of rules for organizing the militia. But the militia itself was the raw material from which an organized fighting force was to be created. Thus, the second Militia Act reads:

> And be it further enacted, That *out of the militia enrolled as is herein directed*, there shall be formed for each battalion at least one company of grenadiers, light infantry or riflemen; and that to each division there shall be at least one company of artillery, and one troop of horse: There shall be to each company of artillery, one captain, two lieutenants, four sergeants, four corporals, six gunners, six bombardiers, one drummer, and one fifer.

*Id.* at 272 (emphasis added).

The crucial point is that the existence of the militia preceded its organization by Congress, and it preceded the implementation of Congress's organizing plan by the states. The District's definition of the militia is just too narrow. The militia was a large segment of the population—not quite synonymous with "the people," as appellants contend—but certainly not the organized "divisions, brigades, regiments,

battalions, and companies" mentioned in the second Militia Act. *Id.* at 272.

The current congressional definition of the "Militia" accords with original usage: "The militia of the United States consists of all able-bodied males at least 17 years of age and . . . under 45 years of age who are, or who have made a declaration of intention to become, citizens of the United States and of female citizens of the United States who are members of the National Guard."  10 U.S.C. § 311.  The statute then distinguishes between the "organized militia," which consists of the National Guard and Naval Militia, and the "unorganized militia," which consists of every member of the militia who is not a member of the National Guard or Naval Militia.  *Id.*  Just as in the 1792 enactment, Congress defined the militia broadly, and, more explicitly than in its founding-era counterpart, Congress provided that a large portion of the militia would remain unorganized.  The District has a similar structure for its own militia: "Every able-bodied male citizen resident within the District of Columbia, of the age of 18 years and under the age of 45 years, excepting . . . idiots, lunatics, common drunkards, vagabonds, paupers, and persons convicted of any infamous crime, shall be enrolled in the militia."  D.C. Code § 49-401.

The District argues that the modifier "well regulated" means that "[t]he militia was not individuals acting on their own; one cannot be a one-person militia."  We quite agree that the militia was a collective body designed to act in concert.  But we disagree with the District that the use of "well regulated" in the constitutional text somehow turns the popular militia embodied in the 1792 Act into a "select" militia that consisted of semi-professional soldiers like our current National Guard. Contemporaneous legislation once again provides us with guidance in reading ambiguous constitutional text.  *See* Op. at 30; *see also Silveira*, 328 F.3d at 579-80 (Kleinfeld, J.).

The second Militia Act provides a detailed list of directions to both individuals and states that we take as an indication of what the drafters of the Second Amendment contemplated as a "well regulated Militia." It will be recalled, the second Militia Act requires that eligible citizens enroll in the militia and, within six months, arm themselves accordingly. Subsequent to enrollment, arming oneself became the first duty of all militiamen. *See Silveira*, 328 F.3d at 581 (Kleinfeld, J.). The Act goes on to require of the states that the militiamen be notified of their enrollment; that within one year, the states pass laws to arrange the militia into divisions, brigades, regiments, battalions, and companies, as well as appoint various militia officers; that there be an Adjutant General appointed in each state to distribute all orders for the Commander in Chief of the State to the several corps, and so on.

The statute thus makes clear that these requirements were independent of each other, i.e., militiamen were obligated to arm themselves regardless of the organization provided by the states, and the states were obligated to organize the militia, regardless of whether individuals had armed themselves in accordance with the statute. We take these dual requirements—that citizens were properly supplied with arms and *subject* to organization by the states (as distinct from actually organized)—to be a clear indication of what the authors of the Second Amendment contemplated as a "well regulated Militia."

Another aspect of "well regulated" implicit in the second Militia Act is the exclusion of certain persons from militia service. For instance, the Act exempts from militia duty "the Vice President of the United States, [executive branch officers and judges], Congressmen, custom house officers, . . . post officers, . . . all Ferrymen employed at any ferry on the post road, . . . all pilots, all mariners actually employed in the sea service of any citizen or merchant within the United States; and

all persons who now are or may be hereafter exempted by the laws of the respective states." Act of May 8, 1792, ch. XXXIII, 1 Stat. 271. Thus, even after the founding-era militia became "well regulated," it did not lose its popular character. The militia still included the majority of adult men (albeit, at the time, "free able-bodied white male[s]"), who were to arm themselves, and whom the states were expected to organize into fighting units. Quite unlike today's National Guard, participation was widespread and mandatory.

As the foregoing makes clear, the "well regulated Militia" was not an elite or select body. *See Silveira*, 328 F.3d at 577-78 (Kleinfeld, J.). While some of the founding fathers, including George Washington and Alexander Hamilton, favored such organizations over a popular militia, *see* THE ORIGIN OF THE SECOND AMENDMENT at xlvii (David E. Young ed., 2d ed. 1995), the Second Congress unambiguously required popular participation. The important point, of course, is that the popular nature of the militia is consistent with an individual right to keep and bear arms: Preserving an individual right was the best way to ensure that the militia could serve when called.

* * *

As we observed, the District argues that *even if* one reads the operative clause in isolation, it supports the collective right interpretation of the Second Amendment. Alternatively, the District contends that the operative clause should not, in fact, be read in isolation, and that it is imbued with the civic character of the prefatory clause when the Amendment is read, correctly, as two interactive clauses. The District points to the singular nature of the Second Amendment's preamble as an indication that the operative clause must be restricted or conditioned in some way by the prefatory language. *Compare* Eugene Volokh, *The Commonplace Second Amendment*, 73 N.Y.U. L. REV. 793

(1998), *with* Michael C. Dorf, *What Does the Second Amendment Mean Today?*, 76 CHI.-KENT L. REV. 291 (2000). However, the structure of the Second Amendment turns out to be not so unusual when we examine state constitutional provisions guaranteeing rights or restricting governmental power. It was quite common for prefatory language to state a principle of good government that was narrower than the operative language used to achieve it. Volokh, *supra*, at 801-07.

We think the Second Amendment was similarly structured. The prefatory language announcing the desirability of a well-regulated militia—even bearing in mind the breadth of the concept of a militia—is narrower than the guarantee of an individual right to keep and bear arms. The Amendment does not protect "the right of militiamen to keep and bear arms," but rather "the right of the people." The operative clause, properly read, protects the ownership and use of weaponry beyond that needed to preserve the state militias. Again, we point out that if the competent drafters of the Second Amendment had meant the right to be limited to the protection of state militias, it is hard to imagine that they would have chosen the language they did. We therefore take it as an expression of the drafters' view that the people possessed a natural right to keep and bear arms, and that the preservation of the militia was the right's most salient political benefit—and thus the most appropriate to express in a political document.

That the Amendment's civic purpose was placed in a preamble makes perfect sense given the then-recent ratification controversy, wherein Antifederalist opponents of the 1787 Constitution agitated for greater assurance that the militia system would remain robust so that standing armies, which were thought by many at the time to be the bane of liberty, would not be necessary. *See* BERNARD BAILYN, THE IDEOLOGICAL ORIGINS OF THE AMERICAN REVOLUTION 338-60 (Enlarged ed.

1992). The Federalists who dominated the First Congress offered the Second Amendment's preamble to palliate Antifederalist concerns about the continued existence of the popular militia. But neither the Federalists nor the Antifederalists thought the federal government had the power to *disarm* the people. This is evident from the ratification debates, where the Federalists relied on the existence of an armed populace to deflect Antifederalist criticism that a strong federal government would lead to oppression and tyranny. Antifederalists acknowledged the argument, but insisted that an armed populace was not enough, and that the existence of a popular militia should also be guaranteed. *Compare* THE FEDERALIST Nos. 8, 28, 59 (Alexander Hamilton), No. 46 (James Madison) (arguing that an armed populace constitutes a check on the potential abuses of the federal government) *with* MELANCTON SMITH [Federal Farmer], OBSERVATIONS TO A FAIR EXAMINATION OF THE SYSTEM OF GOVERNMENT PROPOSED BY THE LATE CONVENTION, AND TO SEVERAL ESSENTIAL AND NECESSARY ALTERATIONS IN IT (Nov. 8, 1787), *reprinted in* THE ORIGIN OF THE SECOND AMENDMENT, *supra*, at 89, 91 (despite the fact that the "yeomanry of the country . . . possess arms" for defense, the federal government could undermine the regular militia and render the armed populace of no importance).

To be sure, as the District argues, the *Miller* Court did draw upon the prefatory clause to interpret the term "Arms" in the operative clause. As we note below, interpreting "Arms" in light of the Second Amendment's militia purpose makes sense because "Arms" is an open-ended term that appears but once in the Constitution and Bill of Rights. But *Miller* does not command that we limit perfectly sensible constitutional text such as "the right of the people" in a manner inconsistent with other constitutional provisions. Similarly, the Second Amendment's use of "keep" does not need to be recast in artificially military terms in order to conform to *Miller*.

We note that when interpreting the text of a constitutional amendment it is common for courts to look for guidance in the proceedings of the Congress that authored the provision. Unfortunately, the Second Amendment's drafting history is relatively scant and inconclusive. *Emerson*, 270 F.3d at 245-51. The recorded debates in the First Congress do not reference the operative clause, a likely indication that the drafters took its individual guarantee as rather uncontroversial. There is certainly nothing in this history to substantiate the strained reading of the Second Amendment offered by the District.

B

We have noted that there is no unequivocal precedent that dictates the outcome of this case. This Court has never decided whether the Second Amendment protects an individual or collective right to keep and bear arms. On one occasion we anticipated an argument about the scope of the Second Amendment, but because the issue had not been properly raised by appellants, we assumed the applicability of the collective right interpretation then urged by the federal government. *Fraternal Order of Police v. United States (F.O.P. II)*, 173 F.3d 898, 906 (D.C. Cir. 1999). The Supreme Court has not decided this issue either. *See id.* As we have said, the leading Second Amendment case in the Supreme Court is *United States v. Miller*. While *Miller* is our best guide, the Supreme Court's other statements on the Second Amendment warrant mention.

In *Dred Scott v. Sandford*, 60 U.S. 393 (1857), the Court asserted the applicability of the Bill of Rights to the territories in the following terms:

> [N]o one . . . will contend that Congress can make any law in a Territory respecting the establishment of religion, or the free exercise thereof, or abridging the

> freedom of speech or of the press, or the right of the people of the Territory peaceably to assemble, and to petition the Government for the redress of grievances . . . *[n]or can Congress deny to the people the right to keep and bear arms*, nor the right to trial by jury, nor compel any one to be a witness against himself in a criminal proceeding . . . . These powers . . . in relation to rights of person . . . are, in express and positive terms, denied to the General Government.

*Id.* at 450 (emphasis added). Although *Dred Scott* is as infamous as it was erroneous in holding that African-Americans are not citizens, this passage expresses the view, albeit in passing, that the Second Amendment contains a personal right. It is included among other individual rights, such as the right to trial by jury and the privilege against self-incrimination. The other Second Amendment cases of the mid-nineteenth century did not touch upon the individual versus collective nature of the Amendment's guarantee.[13]

---

[13]In *United States v. Cruikshank*, 92 U.S. 542, 551 (1876), and *Presser v. Illinois*, 116 U.S. 252, 264-66 (1886), the Court held that the Second Amendment constrained only federal government action and did not apply to the actions of state governments. This holding was reiterated in *Maxwell v. Dow*, 176 U.S. 581, 597 (1900), and *Twining v. New Jersey*, 211 U.S. 78, 98 (1908). Indeed, the Second Amendment is one of the few Bill of Rights provisions that has not yet been held to be incorporated through the Fourteenth Amendment. While the status of the Second Amendment within the twentieth-century incorporation debate is a matter of importance for the many challenges to state gun control laws, it is an issue that we need not decide. The District of Columbia is a Federal District, ultimately controlled by Congress. Although subject to § 1983 suits by federal law, *see* An Act to Permit Civil Suits Under [42 U.S.C. § 1983] Against Any Person Acting Under Color of Any Law or Custom of the District of Columbia, Pub. L. No. 96-170, 93 Stat. 1284 (1979), the

In *Robertson v. Baldwin*, 165 U.S. 275 (1897), the Court addressed the scope of the term "involuntary servitude" in the Thirteenth Amendment. In discussing limitations inherent in that constitutional provision, the Court said the following:

> The law is perfectly well settled that the first 10 amendments to the constitution, commonly known as the "Bill of Rights," were not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities which we had inherited from our English ancestors, and which had, from time immemorial, been subject to certain well-recognized exceptions, arising from the necessities of the case. . . .
>
> Thus, the freedom of speech and of the press (article 1) does not permit the publication of libels, blasphemous or indecent articles, or other publications injurious to public morals or private reputation; *the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons*; the provision that no person shall be twice put in jeopardy (article 5) does not prevent a second trial, if upon the first trial the jury failed to agree, or if the verdict was set aside upon the defendant's motion; nor does the provision of the same article that no one shall be a witness against himself impair his obligation to testify, if a prosecution against him be barred by the lapse of time, a pardon, or by statutory enactment.

District is directly constrained by the entire Bill of Rights, without need for the intermediary of incorporation. *See, e.g.*, *Pernell v. Southall Realty*, 416 U.S. 363, 369-80 (1974) (applying Seventh Amendment to local legislation for the District).

165 U.S. at 281-82 (emphasis added). Just as in *Dred Scott*, the Second Amendment right is mentioned in a catalogue of other well-known individual right provisions, and, in the Supreme Court's thin Second Amendment jurisprudence, *Robertson* has the virtue of straightforwardly suggesting one permissible form of regulatory limitation on the right to keep and bear arms. The decision does not discuss whether the right is individual or collective. Still, *Robertson* tends to cut against any version of the collective right argument. If the right to keep and bear arms offered no protection to individuals, the Court would not likely pick as a noteworthy exception to the right a prohibition on concealed weapons. The individual nature of the permitted regulation suggests that the underlying right, too, concerned personal ownership of firearms.

Few decisions of Second Amendment relevance arose in the early decades of the twentieth century. Then came *Miller*, the Supreme Court's most thorough analysis of the Second Amendment to date, and a decision that both sides of the current gun control debate have claimed as their own. We agree with the *Emerson* court (and the dissenting judges in the Ninth Circuit) that *Miller* does not lend support to the collective right model. *See Silveira*, 328 F.3d at 586-87 (Kleinfeld, J.); *Emerson*, 270 F.3d at 226-27. Nor does it support the District's quasi-collective position. Although *Miller* did not explicitly accept the individual right position, the decision implicitly assumes that interpretation.

*Miller* involved a Second Amendment challenge by criminal defendants to section 11 of the National Firearms Act (then codified at 26 U.S.C. §§ 1132 *et seq*.), which prohibited interstate transportation of certain firearms without a registration or stamped order. The defendants had been indicted for transporting a short-barreled shotgun from Oklahoma to Arkansas in contravention of the Act. The district court

sustained defendants' demurrer challenging their indictment on Second Amendment grounds. The government appealed. The defendants submitted no brief and made no appearance in the Supreme Court. *Miller*, 307 U.S. at 175-77. Hearing the case on direct appeal, the Court reversed and remanded. *Id.* at 183.

On the question whether the Second Amendment protects an individual or collective right, the Court's opinion in *Miller* is most notable for what it omits. The government's first argument in its *Miller* brief was that "the right secured by [the Second Amendment] to the people to keep and bear arms is not one which may be utilized for private purposes but only one which exists where the arms are borne in the militia or some other military organization provided for by law and intended for the protection of the state." Appellant's Br. at 15, 307 U.S. 704 (No. 696). This is a version of the collective right model. Like the Fifth Circuit, we think it is significant that the Court did not decide the case on this, the government's primary argument. *Emerson*, 270 F.3d at 222. Rather, the Court followed the logic of the government's secondary position, which was that a short-barreled shotgun was not within the scope of the term "Arms" in the Second Amendment.

The government had argued that even those courts that had adopted an individual right theory of the Second Amendment[14] had held that the term "Arms," as used in both the Federal and various state constitutions, referred "only to those weapons which are ordinarily used for military or public defense purposes and does not relate to those weapons which are commonly used by criminals." Appellant's Br. at 18, 307 U.S. 704 (No. 696).

---

[14]Here the brief for the United States cites two state court decisions interpreting state constitutional provisions: *People v. Brown*, 253 Mich. 537 (1931); *State v. Duke*, 42 Tex. 455 (1875). *See* Appellant's Br. at 18, 307 U.S. 704 (No. 696).

The government then proceeded to quote at length from a Tennessee state court case interpreting "Arms" in the Tennessee Bill of Rights to mean weapons "such as are usually employed in civilized warfare, and that constitute the ordinary military equipment." *Id.* (quoting *Aymette v. State*, 20 Tenn. (1 Hum.) 154, 157 (1840)). The government's weapons-based argument provided the *Miller* Court with an alternative means to uphold the National Firearms Act even if the Court disagreed with the government's collective right argument. The *Miller* Court's holding is based on the government's alternative position:

> In the absence of any evidence tending to show that possession or use of a "shotgun having a barrel of less than eighteen inches in length" at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear *such an instrument*. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense. *Aymette v. State*, 2 Humphreys (Tenn.) 154, 158.

*Miller*, 307 U.S. at 178 (emphasis added). The quotation makes apparent that the Court was focused only on what arms are protected by the Second Amendment, *see Emerson*, 270 F.3d at 224, and not the collective or individual nature of the right. If the *Miller* Court intended to endorse the government's first argument, i.e., the collective right view, it would have undoubtedly pointed out that the two defendants were not affiliated with a state militia or other local military organization. *Id.*

To be sure, the *Miller* Court linked the Second Amendment's language to the Constitution's militia clause:

"With obvious purpose to assure the continuation and render possible the effectiveness of such forces [i.e., the militia] the declaration and guarantee of the Second Amendment were made. It must be interpreted and applied with that end in view." 307 U.S. at 178. We take the "declaration and guarantee" referred to by the *Miller* Court to mean the Second Amendment's prefatory clause (which declares the necessity of a "well regulated Militia") and its operative clause (which guarantees the preservation of a right) respectively.

The District would have us read this passage as recognizing a limitation on the Second Amendment right based on the *individual*'s connection (or lack thereof) to an organized functioning militia. We disagree. As already discussed, the *Miller* court was examining the relationship between the *weapon* in question—a short-barreled shotgun—and the preservation of the militia system, which was the Amendment's politically relevant purpose. The term "Arms" was quite indefinite, but it would have been peculiar, to say the least, if it were designed to ensure that people had an individual right to keep weapons capable of mass destruction—e.g., cannons. Thus the *Miller* Court limited the term "Arms"—interpreting it in a manner consistent with the Amendment's underlying civic purpose. Only "Arms" whose "use or possession . . . has some reasonable relationship to the preservation or efficiency of a well regulated militia," *id.* at 177, would qualify for protection.

Essential, then, to understanding what weapons qualify as Second Amendment "Arms" is an awareness of how the founding-era militia functioned. The Court explained its understanding of what the Framers had in mind when they spoke of the militia in terms we have discussed above. The members of the militia were to be "civilians primarily, soldiers on occasion." *Id.* at 179. When called up by either the state or the federal government, "these men were expected to appear

*bearing arms supplied by themselves and of the kind in common use at the time*." *Id.* (emphasis added).

As we noted above, the "Militia" was vast, including all free, white, able-bodied men who were properly enrolled with a local militia officer. By contrast, the Ninth Circuit has recently (and we think erroneously) read "Militia" to mean a "state-created and state-organized fighting force" that excludes the unorganized populace. *Silveira*, 312 F.3d at 1069. As Judge Kleinfeld noted, the Ninth Circuit's decision entirely ignores *Miller*'s controlling definition of the militia. 328 F.3d at 578 (dissenting from denial of rehearing en banc). The Ninth Circuit's interpretation of "Militia" also fails to account for the second Militia Act of 1792, *id.* at 578-82, as well as local *federal* militia units such as those provided for by the Northwest Ordinance, *see* Act of Aug. 7, 1789, ch. VIII, 1 Stat. 50, or for the District of Columbia in 1803, Act of March 3, 1803, ch. XX, 2 Stat. 215.

*Miller*'s definition of the "Militia," then, offers further support for the individual right interpretation of the Second Amendment. Attempting to draw a line between the ownership and use of "Arms" for *private* purposes and the ownership and use of "Arms" for *militia* purposes would have been an extremely silly exercise on the part of the First Congress if indeed the very survival of the militia depended on men who would bring their commonplace, *private* arms with them to muster. A ban on the use and ownership of weapons for private purposes, if allowed, would undoubtedly have had a deleterious, if not catastrophic, effect on the readiness of the militia for action. We do not see how one could believe that the First Congress, when crafting the Second Amendment, would have engaged in drawing such a foolish and impractical distinction, and we think the *Miller* Court recognized as much.

\* \* \*

To summarize, we conclude that the Second Amendment protects an individual right to keep and bear arms. That right existed prior to the formation of the new government under the Constitution and was premised on the private use of arms for activities such as hunting and self-defense, the latter being understood as resistance to either private lawlessness or the depredations of a tyrannical government (or a threat from abroad). In addition, the right to keep and bear arms had the important and salutary civic purpose of helping to preserve the citizen militia. The civic purpose was also a political expedient for the Federalists in the First Congress as it served, in part, to placate their Antifederalist opponents. The individual right facilitated militia service by ensuring that citizens would not be barred from keeping the arms they would need when called forth for militia duty. Despite the importance of the Second Amendment's civic purpose, however, the activities it protects are not limited to militia service, nor is an individual's enjoyment of the right contingent upon his or her continued or intermittent enrollment in the militia.

IV

As a corollary to its collective right position, the District argues—albeit almost as an afterthought—that it is not subject to the restraints of the Second Amendment because it is a purely federal entity.[15] Although it has a militia statute, *see* D.C. Code § 49-401, the District argues that its militia does not implicate

---

[15]This contention originated in a concurring opinion in the District of Columbia Court of Appeals, *see Sandidge v. United States*, 520 A.2d 1057, 1059 (D.C. 1987) (Nebeker, J.), and has been subsequently adopted by a federal district court, *see Seegars v. Aschcroft*, 297 F. Supp. 2d 201, 238-39 (D.D.C. 2004).

federalism concerns embodied in the Second Amendment—i.e., the District's local legislation does not interfere with the "security of a free State."

The District does not argue, nor could it, that even if the Second Amendment confers an individual right, that right is enjoyed only by the residents of states (that would mean that citizens of the United States who lived in territories, such as the Northwest Territory, prior to their acceptance as states, did not enjoy a constitutional right).  In any event, the Supreme Court has unambiguously held that the Constitution and Bill of Rights are in effect in the District.  *See O'Donoghue v. United States*, 289 U.S. 516, 539-41(1933) (quoting *Downes v. Bidwell*, 182 U.S. 244, 260-61 (1901)).  "The mere cession of the District of Columbia to the Federal government relinquished the authority of the states, but it did not take it out of the United States or from under the aegis of the Constitution. . . . If, before the District was set off, Congress had passed an unconstitutional act affecting its inhabitants, it would have been void.  If done after the District was created, it would have been equally void; in other words, Congress could not do indirectly, by carving out the District, what it could not do directly.  The District still remained a part of the United States, protected by the Constitution."  *Id.* at 541.  Rather, the District's argument amounts to an appendage of the collective right position.  It is only if one reads the prefatory language as limiting the operative clause to a guarantee about militias that one ever arrives at the question whether the guarantee is confined to *state* militias.

Our dissenting colleague recognizes this point; her opinion begins with an acceptance of the collective right interpretation of the Second Amendment.  Dissent at 2-7.  It is therefore not clear to us that it is even relevant to discuss the meaning of "a

free State"—language upon which the dissent heavily relies.[16] Still, taking the argument as presented, we think it wrong on several grounds. First, the dissent (and the District) mistakenly reads "a free State" to mean an actual political unit of the United States, such as New York, etc., rather than a hypothetical polity. In fact, Madison's initial proposal to the First Congress stated that a well-regulated militia was "the best security of a free country." THE COMPLETE BILL OF RIGHTS, *supra*, at 169. The House committee then substituted "State" for "country" when it initially altered Madison's proposal. We have no record of the House committee's proceedings, but it is not credible to conclude that a profound shift was intended in the change from "country" to "State," particularly as there was no subsequent comment on the change.

The record of the debates in the First Congress relied upon by our dissenting colleague only further undermines the reading of "a free State" as meaning an individual state of the union. As she points out, Elbridge Gerry, an Antifederalist Representative from Massachusetts, criticized an initial formulation of the Second Amendment as follows: "A well regulated militia being the best security of a free state, admitted an idea that a standing army was a secondary one." Dissent at 9 n.10. Gerry's obvious fear was that a standing army would be erected as an auxiliary defense of "a free State," and that eventually such an army would entirely displace the militia. That Gerry worried a standing army would be understood as the "secondary" security of a free state, however, indicates that he understood "a free State" to mean the new country *as a whole*. After all, no one

---

[16]The dissent suggests that our opinion consists largely of dicta. Dissent at 1. But dictum refers to reasoning that does not support the holding of a case. We think all of our reasoning (whether correct or not) directly supports our holding. By contrast, the dissent's "free State" discussion might be thought superfluous.

contended that a standing federal army would be used to protect *individual* states. It was the entire nation, including the District of Columbia, that a standing army would be erected to defend, and thus if a standing army were to supplant the militia in securing "a free State," the "State" in question would undoubtedly have been the United States.

The use of both the indefinite article and the modifier "free" with the word "state," moreover, is unique to the Second Amendment. Elsewhere the Constitution refers to "the states" or "each state" when unambiguously denoting the domestic political entities such as Virginia, etc. With "a free State," we understand the framers to have been referring to republican government generally. The entire purpose of making the militia subject to the authority of the national government was that a standing army would not be necessary. The District's militia, organized by Congress in 1803, *see* Act of March 3, 1803, ch. XX, 2 Stat. 215, was no less integral to that *national* function than its state counterparts. That the D.C. militia is not a state militia does not make it any less necessary to the "security of a free State."

The dissent notes a Supreme Court statement in *Perpich v. Department of Defense*, 496 U.S. 334 (1990), that "there was a widespread fear that a national standing Army posed an intolerable threat to individual liberty and to the *sovereignty of the separate States*." *Id.* at 340 (emphasis added in dissent). However, the dissent overlooks the other concern with standing armies—that they would pose a threat to *individual liberty*. The language from *Perpich* is entirely consistent, then, with the view that the American people at large (including the residents of the District) would be equally threatened by the presence of a standing army. And it directly contradicts the dissent's position that the Second Amendment was concerned exclusively with the preservation of state power.

Our dissenting colleague—in order to give a meaning to "the people" in the Second Amendment consistent with her interpretation—analogizes to "the people" in the Tenth Amendment. Dissent at 5 n.5. Contrary to her suggestion, however, the Tenth Amendment does not limit "the people" to state citizens. Rather, the Tenth Amendment reserves powers to "the States respectively, or to the people." The dissent provides no case holding that "the people," as used in the Tenth Amendment, are distinct from "the people" referred to elsewhere in the Bill of Rights. The one case relied upon, *Lee v. Flintkote*, 593 F.2d 1275, 1278 n.14 (D.C. Cir. 1979), is inapposite. That case merely contrasts the District, on the one hand, with the states, on the other; the meaning of "the people" as used in the Tenth Amendment was not at issue. Indeed, *Verdugo-Urquidez*, 494 U.S. at 265, directly contradicts the dissent's reading of "the people" in the Tenth Amendment, just as it contradicts the restrictive reading of "the people" in the Second.

V

The third alternative argument the District presents is that, even if the Second Amendment protects an individual right and applies to the District, it does not bar the District's regulation, indeed its virtual prohibition, of handgun ownership.

The District contends that modern handguns are not the sort of weapons covered by the Second Amendment. But the District's claim runs afoul of *Miller*'s discussion of "Arms." The *Miller* Court concluded that the defendants, who did not appear in the Supreme Court, provided no showing that short-barreled (or sawed-off) shotguns—banned by federal statute—bore "some reasonable relationship to the preservation or efficiency of a well regulated militia." *Miller*, 307 U.S. at

178. However, the Court also observed that militiamen were expected to bring their private arms with them when called up for service. Those weapons would be "of the kind in common use at the time." *Id.* at 179. There can be no question that most handguns (those in common use) fit that description then and now. *See Emerson*, 270 F.3d at 227 n.22 (assuming that a Beretta pistol passed the *Miller* test).

By the terms of the second Militia Act of 1792, all militiamen were given six months from the date of their enrollment to outfit themselves with "a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch, with a box therein, to contain not less than twenty four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball: or with a good *rifle*, knapsack, shot-pouch, and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder . . . ." Act of May 8, 1792, ch. XXXIII, 1 Stat. 271 (emphasis added).

Commissioned officers had somewhat more onerous requirements. The Act demanded that, in addition to the foregoing, they "shall severally be armed with a sword or hanger and espontoon . . . ." *Id.* at 271-72. Still further demands were placed on the artillery officers, who were to be "armed with a sword or hanger, a fusee, bayonet and belt, with a cartridge-box to contain twelve cartridges . . . ." *Id.* at 272. But commissioned cavalry officers and dragoons had to assume an even greater expense, perhaps due to the fact that these were volunteer positions reserved for the well-off. The cavalry officers were required to procure "good horses of at least fourteen hands and a half high, and to be armed with a sword and pair of *pistols*, the holsters of which to be covered with bearskin caps." The dragoon had it even worse, being required to furnish himself "a serviceable horse, at least fourteen hands

and a half high, a good saddle, bridle, mailpillion and valise, holsters, and a breast-plate and crupper, a pair of boots and spurs, a pair of *pistols*, a sabre, and a cartouch-box, to contain twelve cartridges for pistols." *Id.* at 272 (emphasis added).

These items were not mere antiques to be hung above the mantle. Immediately following the list of required weapons purchases, the Act provided that militiamen "shall appear so *armed*, accoutred and provided, when called out to exercise, or into service . . . ." *Id.* (emphasis added). The statute even planned phased-in upgrades in the quality of the militia's firearms: "[F]rom and after five years from the passing of this act, all muskets for arming the militia as herein required, shall be of bores sufficient for balls of the eighteenth part of a pound." *Id.* at 271-72.

It follows that the weapons described in the Act were in "common use" at the time, particularly when one considers the widespread nature of militia duty. Included among these militia weapons were long guns (i.e., muskets and rifles) and pistols. Moreover, the Act distinguishes between the weapons citizens were required to furnish themselves and those that were to be supplied by the government. For instance, with respect to an artillery private (or "matross"), the Act provides that he should "furnish himself with all the equipments of a private in the infantry, until proper ordnance and field artillery is provided." *Id.* at 272. The Act required militiamen to acquire weapons that were in common circulation and that individual men would be able to employ, such as muskets, rifles, pistols, sabres, hangers, etc., but not cumbersome, expensive, or rare equipment such as cannons. We take the outfitting requirements of the second Militia Act to list precisely those weapons that would have satisfied the two prongs of the *Miller* arms test. They bore a "reasonable relationship to the preservation or efficiency of a well regulated militia," because they were the very arms needed

for militia service. And by the terms of the Act, they were to be personally owned and "of the kind in common use at the time."

The modern handgun—and for that matter the rifle and long-barreled shotgun—is undoubtedly quite improved over its colonial-era predecessor, but it is, after all, a lineal descendant of that founding-era weapon, and it passes *Miller*'s standards. Pistols certainly bear "some reasonable relationship to the preservation or efficiency of a well regulated militia." They are also in "common use" today, and probably far more so than in 1789. Nevertheless, it has been suggested by some that only colonial-era firearms (e.g., single-shot pistols) are covered by the Second Amendment. But just as the First Amendment free speech clause covers modern communication devices unknown to the founding generation, e.g., radio and television, and the Fourth Amendment protects telephonic conversation from a "search," the Second Amendment protects the possession of the modern-day equivalents of the colonial pistol. *See, e.g.*, *Kyllo v. United States*, 533 U.S. 27, 31-41 (2001) (applying Fourth Amendment standards to thermal imaging search).

That is not to suggest that the government is absolutely barred from regulating the use and ownership of pistols. The protections of the Second Amendment are subject to the same sort of reasonable restrictions that have been recognized as limiting, for instance, the First Amendment. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("[G]overnment may impose reasonable restrictions on the time, place, or manner of protected speech . . . ."). Indeed, the right to keep and bear arms—which we have explained pre-existed, and therefore was preserved by, the Second Amendment—was subject to restrictions at common law. We take these to be the sort of reasonable regulations contemplated by the drafters of the Second Amendment. For instance, it is presumably reasonable "to prohibit the carrying of weapons when under the influence

of intoxicating drink, or to a church, polling place, or public assembly, or in a manner calculated to inspire terror . . . ." *State v. Kerner*, 107 S.E. 222, 225 (N.C. 1921). And as we have noted, the United States Supreme Court has observed that prohibiting the carrying of concealed weapons does not offend the Second Amendment. *Robertson*, 165 U.S. at 281-82. Similarly, the Court also appears to have held that convicted felons may be deprived of their right to keep and bear arms. *See Lewis v. United States*, 445 U.S. 55, 65 n.8 (1980) (citing *Miller*, 307 U.S. at 178). These regulations promote the government's interest in public safety consistent with our common law tradition. Just as importantly, however, they do not impair the core conduct upon which the right was premised.

Reasonable restrictions also might be thought consistent with a "well regulated Militia." The registration of firearms gives the government information as to how many people would be armed for militia service if called up. Reasonable firearm proficiency testing would both promote public safety and produce better candidates for military service. Personal characteristics, such as insanity or felonious conduct, that make gun ownership dangerous to society also make someone unsuitable for service in the militia. *Cf.* D.C. Code § 49-401 (excluding "idiots, lunatics, common drunkards, vagabonds, paupers, and persons convicted of any infamous crime" from militia duty). On the other hand, it does not follow that a person who is unsuitable for militia service has no right to keep and bear arms. A physically disabled person, for instance, might not be able to participate in even the most rudimentary organized militia. But this person would still have the right to keep and bear arms, just as men over the age of forty-five and women would have that right, even though our nation has traditionally excluded them from membership in the militia. As we have

explained, the right is broader than its civic purpose. *See* Volokh, *supra*, at 801-07.[17]

D.C. Code § 7-2502.02[18] prohibits the registration of a pistol not registered in the District by the applicant prior to 1976.[19] The District contends that since it only bans one type of firearm, "residents still have access to hundreds more," and thus

---

[17]Of course, the District's virtual ban on handgun ownership is not based on any militia purpose. It is justified solely as a measure to protect public safety. As amici point out, and as D.C. judges are well aware, the black market for handguns in the District is so strong that handguns are readily available (probably at little premium) to criminals. It is asserted, therefore, that the D.C. gun control laws irrationally prevent only law abiding citizens from owning handguns. It is unnecessary to consider that point, for we think the D.C. laws impermissibly deny Second Amendment rights.

[18]The relevant text of the provision reads as follows:

(a) A registration certificate shall not be issued for a:

. . .

(4) Pistol not validly registered to the current registrant in the District prior to September 24, 1976, except that the provisions of this section shall not apply to any organization that employs at least 1 commissioned special police officer or other employee licensed to carry a firearm and that arms the employee with a firearm during the employee's duty hours or to a police officer who has retired from the Metropolitan Police Department.

D.C. Code § 7-2502.02.

[19]Although not relevant here, there is also an exception to the registration restriction for retired police officers of the Metropolitan Police Department. *See* D.C. Code § 7-2502.02(b) .

its prohibition does not implicate the Second Amendment because it does not threaten total disarmament. We think that argument frivolous. It could be similarly contended that all firearms may be banned so long as sabers were permitted. Once it is determined—as we have done—that handguns are "Arms" referred to in the Second Amendment, it is not open to the District to ban them. *See Kerner*, 107 S.E. at 225 ("To exclude all pistols . . . is not a regulation, but a prohibition, of . . . 'arms' which the people are entitled to bear."). Indeed, the pistol is the most preferred firearm in the nation to "keep" and use for protection of one's home and family. *See* Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 182-83 (1995). And, as we have noted, the Second Amendment's premise is that guns would be kept by citizens for self-protection (and hunting).

D.C. Code § 22-4504[20] restricts separately the carrying of

---

[20]The relevant text of the provision reads as follows:

(a) No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon capable of being so concealed. Whoever violates this section shall be punished as provided in § 22-4515, except that:

(1) A person who violates this section by carrying a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon, in a place other than the person's dwelling place, place of business, or on other land possessed by the person, shall be fined not more than $5,000 or imprisoned for not more than 5 years, or both . . . .

D.C. Code § 22-4504.

a pistol. Appellant Heller challenges this provision and a companion provision, § 22-4506, insofar as they appear to ban moving a handgun from room to room in one's own house, even if one has lawfully registered the firearm (an interpretation the District does not dispute). In order to carry a pistol anywhere in the District (inside or outside the home), one must apply for and obtain an additional license from the Chief of Police, whom the Code gives complete discretion to deny license applications. Heller does not claim a legal right to carry a handgun outside his home, so we need not consider the more difficult issue whether the District can ban the carrying of handguns in public, or in automobiles. It is sufficient for us to conclude that just as the District may not flatly ban the keeping of a handgun in the home, obviously it may not prevent it from being moved throughout one's house. Such a restriction would negate the lawful use upon which the right was premised—i.e, self-defense.

Finally, there is the District's requirement under D.C. Code § 7-2507.02 that a registered firearm be kept "unloaded and disassembled or bound by trigger lock or similar device, unless such firearm is kept at [a] place of business, or while being used for lawful recreational purposes within the District of Columbia." This provision bars Heller from lawfully using a handgun for self protection in the home because the statute allows only for use of a firearm during recreational activities. As appellants accurately point out, § 7-2507.02 would reduce a pistol to a useless hunk of "metal and springs." Heller does not appear to challenge the requirement that a gun ordinarily be kept unloaded or even that a trigger lock be attached under some circumstances. He simply contends that he is entitled to the possession of a "functional" firearm to be employed in case of a threat to life or limb. The District responds that, notwithstanding the broad language of the Code, a judge would likely give the statute a narrowing construction when confronted with a self-defense justification. That might be so, but judicial

lenity cannot make up for the unreasonable restriction of a constitutional right. Section 7-2507.02, like the bar on carrying a pistol within the home, amounts to a complete prohibition on the lawful use of handguns for self-defense. As such, we hold it unconstitutional.

## VI

For the foregoing reasons, the judgment of the district court is reversed and the case is remanded. Since there are no material questions of fact in dispute, the district court is ordered to grant summary judgment to Heller consistent with the prayer for relief contained in appellants' complaint.

KAREN LeCRAFT HENDERSON, *Circuit Judge*, dissenting:

As has been noted by Fifth Circuit Judge Robert M. Parker in *United States v. Emerson*, 270 F.3d 203, 272 (2001) ("The fact that the 84 pages of dicta contained in [the majority opinion] are interesting, scholarly, and well written does not change the fact that they are dicta and amount to at best an advisory treatise on this long-running debate.") (Parker, J., concurring), exhaustive opinions on the origin, purpose and scope of the Second Amendment to the United States Constitution have proven to be irresistible to the federal judiciary. *See, e.g., Silveira v. Lockyer*, 312 F.3d 1052, 1060-87 (9th Cir. 2003) (as amended); *Emerson*, 270 F.3d at 218-72. The result has often been page after page of "dueling dicta"—each side of the debate offering law review articles and obscure historical texts to support an outcome it deems proper. Today the majority adds another fifty-plus pages to the pile.[1] Its superfluity is even more pronounced, however, because the meaning of the Second Amendment in the District of Columbia (District) is purely academic. Why? As Judge Walton declared in *Seegars v. Ashcroft*, 297 F. Supp. 2d 201, 239 (D.D.C. 2004), *aff'd in part, rev'd in part sub nom. Seegars v. Gonzales*, 396

---

[1]In declaring the District's challenged firearms ordinances unconstitutional, the majority takes over 45 pages, Maj. Op. at 12-58, explaining that the Second Amendment establishes an unrestricted individual right to keep and bear arms, *see id.* at 46. Its analysis can be summarized as follows: The Second Amendment's guarantee clause—"the right of the people to keep and bear Arms, shall not be infringed"—endows "the people" with a right analogous to the individual rights guaranteed in the First and Fourth Amendments. *Id.* at 18-21 (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). That right is unrestricted by the prefatory clause—"A well regulated Militia, being necessary to the security of a free State"—which simply enunciates the Amendment's "civic purpose," Maj. Op. at 46, and modifies only the word "Arms" in the operative clause, *id.* at 37-38 (citing *United States v. Miller*, 307 U.S. 174 (1939)).

F.3d 1248, *reh'g en banc denied,* 413 F.3d 1 (2005), "the District of Columbia is not a state within the meaning of the Second Amendment and therefore the Second Amendment's reach does not extend to it." For the following reasons, I respectfully dissent.

## I.

As our court has recognized, the United States Supreme Court's guidance on the Second Amendment is "notoriously scant." *Fraternal Order of Police v. United States*, 173 F.3d 898, 906 (D.C. Cir. 1999) (*FOP*). While scant it may be, it is, at least to me, unmistakable in one respect. And in that one respect, it dooms appellant Heller's challenge.[2]

In *United States v. Miller*, 307 U.S. 174 (1939), the only twentieth-century United States Supreme Court decision that analyzes the scope of the Second Amendment, the Government appealed the district court's quashing of an indictment that charged Miller (and one other) with a violation of section 11 of

---

[2]The other five appellants lack standing, *see Seegars v. Gonzalez*, 396 F.3d 1248 (D.C. Cir. 2005), and Heller has standing to challenge only D.C. Code § 7-2502.02(a)(4), under which he applied for, and was denied, a pistol permit. The *only* difference between the standing of the appellants in this case and that of the *Seegars* appellants relates to Heller's permit denial. That is, none of the appellants here, including Heller, faces imminent injury from D.C. Code § 7-2507.02, which requires that any registered firearm be kept unloaded and disassembled or bound by a trigger lock or similar device, or section 22-4504, which prohibits carrying an unregistered pistol. They "allege no prior threats against them [based on those provisions] or any characteristics indicating an especially high probability of enforcement [of those provisions] against them." *Seegars*, 396 F.3d at 1255. Although the appellants lack an administrative remedy with respect to the trigger lock provision, we have already decided "its absence is not enough to render [their] claim[s] justiciable if the imminence of the threatened injury is inadequate." *Id.* at 1256.

the National Firearms Act, Pub. L. No. 474, 48 Stat. 1236, 26 U.S.C. §§ 1132 *et seq.* (1934), by transporting in interstate commerce an unregistered, short-barreled shotgun. *Miller*, 307 U.S. at 175 & n.1. The district court had quashed the indictment because it concluded that section 11 of the National Firearms Act violated the Second Amendment. *Id.* at 177. The High Court disagreed, declaring:

> *In the absence of* any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has *some reasonable relationship to the preservation or efficiency of a well regulated militia*, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.

*Id.* at 178 (emphases added). Then, quoting Article I, § 8 of the Constitution,[3] the Court succinctly—but unambiguously—set down its understanding of the Second Amendment: "With

---

[3]Article I, section 8 of the Constitution provides:

The Congress shall have Power . . .

> To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;

> To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress.

U.S. Const., Art. I, § 8, cls. 15-16.

4

obvious purpose to assure the continuation and render possible the effectiveness of such forces the *declaration and guarantee* of the Second Amendment were made. *It must be interpreted and applied with that end in view*." *Id.* (emphases added). By these words, it emphatically declared that the *entire* Second Amendment—both its "declaration" and its "guarantee"—"must be interpreted and applied" together. *Id.*[4]  Construing its two

---

[4]Nine of our sister circuits have noted that the declaratory clause modifies the guarantee clause. *See Silveira*, 312 F.3d at 1066 ("The amendment protects the people's right to maintain an effective state militia, and does not establish an individual right to own or possess firearms for personal or other use."); *Gillespie v. City of Indianapolis*, 185 F.3d 693, 711 (7th Cir. 1999) ("Because Gillespie has no reasonable prospect of being able to demonstrate . . . a nexus between the firearms disability imposed by the statute and the operation of state militias, [the district court judge] was right to dismiss his Second Amendment claim."); *United States v. Wright*, 117 F.3d 1265, 1273 (11th Cir. 1997) ("[T]he *Miller* Court understood the Second Amendment to protect only the possession or use of weapons that is reasonably related to a militia actively maintained and trained by the states."); *United States v. Rybar*, 103 F.3d 273, 286 (3d Cir. 1996) ("[T]he *Miller* Court assigned no special importance to the character of the weapon itself, but instead demanded a reasonable relationship between its 'possession or use' and militia-related activity."(quoting *Miller*, 307 U.S. at 178)); *Love v. Pepersack*, 47 F.3d 120, 124 (4th Cir. 1995) ("The courts have consistently held that the Second Amendment only confers a collective right of keeping and bearing arms which must bear a 'reasonable relationship to the preservation or efficiency of a well-regulated militia.'" (quoting *Miller*, 307 U.S. at 178)); *United States v. Hale*, 978 F.2d 1016, 1020 (8th Cir. 1992) ("Whether the 'right to bear arms' for militia purposes is 'individual' or 'collective' in nature is irrelevant where, as here, the individual's possession of arms is not related to the preservation or efficiency of a militia."); *United States v. Oakes*, 564 F.2d 384, 387 (10th Cir. 1977) ("The purpose of the second amendment as stated by the Supreme Court in *United States v. Miller* . . . was to preserve the effectiveness

clauses together so that, as *Miller* declares, the right of the people[5] to keep and bear arms relates to those Militia whose

and assure the continuation of the state militia. The Court stated that the amendment must be interpreted and applied with that purpose in view."); *United States v. Warin*, 530 F.2d 103, 106 (6th Cir. 1976) ("[T]he Second Amendment right 'to keep and bear Arms' applies only to the right of the State to maintain a militia and not to the individual's right to bear arms . . . ." (internal quotation omitted)); *Cases v. United States*, 131 F.2d 916, 923 (1st Cir. 1942) ("[T]here is no evidence that the appellant was or ever had been a member of any military organization or that his use of the weapon under the circumstances disclosed was in preparation for a military career."). In *Cases*, the First Circuit considered, *inter alia*, a Puerto Rican criminal defendant's Second Amendment challenge to the Federal Firearms Act. Significantly, the court qualified its Second Amendment analysis as follows:

> The applicability of the restriction imposed by the Second Amendment upon the power of Congress to legislate for Puerto Rico, or for that matter any territory, raises questions of no little complexity. However, we do not feel called upon to consider them because we take the view that the Federal Firearms Act does not unconstitutionally infringe the appellant's right, if any one in a territory has any right at all, to keep and bear arms.

*Cases*, 131 F.2d at 920.

[5]I have not overlooked the language in *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990), to the effect that "the people" as used in various of the first Ten Amendments refers to "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." But just as the Tenth Amendment ties the rights reserved thereunder to "the people" of the individual "States," thereby excluding "the people" of the District, *cf. Lee v. Flintkote Co.*, 593 F.2d 1275, 1278 n.14 (D.C. Cir. 1979) ("[T]he District, unlike the states, has no reserved power to be guaranteed by the Tenth

continued vitality is required to safeguard the individual States, I believe that, under *Miller*, the District is inescapably excluded from the Second Amendment because it is not a State.[6] However the Second Amendment right has been subsequently labeled by others—whether collective, individual or a modified version of either—*Miller*'s label is the only one that matters.[7]  And until and unless the Supreme Court revisits *Miller*, its reading of the Second Amendment is the one we are obliged to follow.  *See Welch v. Tex. Dep't of Highways & Pub. Transp.*, 483 U.S. 468,

---

Amendment."), the Second Amendment similarly limits "the people" to those of the States, *cf. Adams v. Clinton*, 90 F. Supp. 2d 35, 45 (D.D.C. 2000) ("Although standing alone the phrase 'people of the several States' [in Article I, § 2, cl.1] could be read as meaning all the people of the 'United States' and not simply those who are citizens of individual states, [Article I's] subsequent and repeated references to 'state[s]' . . . make clear that the former was not intended."); *see also Verdugo-Urquidez*, 494 U.S. at 265 (citing U.S. Const. Art. I, § 2, cl. 1).

[6]Nor do the Militia Clauses (U.S. Const. Art. I, § 8, cls. 15,16) conflict with the view that the "Militia" of the Second Amendment means those of the States.  As used in the Militia Clauses, "Militia" is plural.  Indeed, Article I, section 8, clause 16 states that the Congress shall have the power "[t]o provide for organizing, arming, and disciplining, *the Militia*, and for governing such Part of *them*." (emphasis added).  Article II, section 2 also indicates the Militia Clauses refer to "the Militia *of the several States*."  U.S. Const. Art. II, § 2, cl. 1 (emphasis added); *cf.* Oxford English Dictionary 768 (2d ed. 1989) ("Militia" "**4.** *spec.* **a.** Orig., the distinctive name of a branch of the British military service, forming, together with the volunteers, what are known as 'the auxiliary forces' as distinguished from the regular army. . . .  (Construed either as *sing.* or *plural*.)").

[7]Our court has previously "assume[d]" the *Miller* "test" to mean that the guarantee must be read in light of the declaration.  *See FOP*, 173 F.3d at 906.

478-79 (1987) ("The rule of law depends in large part on adherence to the doctrine of *stare decisis*."); *United States v. Rybar*, 103 F.3d 273, 286 (3d Cir. 1996) ("As one of the inferior federal courts subject to the Supreme Court's precedents, we have neither the license nor the inclination to engage in such freewheeling presumptuousness." (responding to argument that *Miller* is "wrong in its superficial (and one-sided) analysis of the Second Amendment" (internal quotation omitted))).[8]

---

[8]One nineteenth-century Supreme Court precedent, *United States v. Cruikshank*, 92 U.S. 542 (1875), is included in almost every discussion of the Second Amendment. *Miller*, however, does not cite *Cruikshank*, and for good reason. In that case, several criminal defendants challenged their convictions under the Enforcement Act of 1870 making it unlawful to threaten or intimidate "'any citizen, with intent to prevent or hinder his free exercise and enjoyment of any right or privilege granted or secured to him by the constitution or laws of the United States.'" *Id.* at 548 (quoting 16 Stat. 141). In setting aside their convictions, the Supreme Court declared:

> [The right to bear arms for any lawful purpose] is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed; but this, as has been seen, means no more than that it shall not be infringed by Congress.

*Id.* at 553. This language does not conflict with *Miller*—as I read *Miller*—because it does not define the right but simply recognizes that the right, whatever its content, cannot be infringed by the federal government. More interesting is the nineteenth-century case *Miller* does cite, *Presser v. Illinois*, 92 U.S. 542 (1886). There, the Court upheld state legislation against a Second Amendment challenge, relying on *Cruikshank*'s holding that the Second Amendment constrains the national government only. The Court then included the following language:

> [T]he states cannot, even laying the constitutional provision in question out of view, prohibit the people from keeping and

## II.

The Supreme Court has long held that "State" as used in the Constitution refers to one of the States of the Union. Chief Justice John Marshall, in rejecting the argument that the District constitutes a "State" under Article III, section 2 of the Constitution and, derivatively, the Judiciary Act of 1789, explained:

> [I]t has been urged that Columbia is a distinct political society; and is therefore "a state" according to the definitions of writers on general law. This is true. But as the act of congress obviously uses the word "state" in reference to that term as used in the constitution, it becomes necessary to inquire whether Columbia is a state in the sense of that instrument. The result of that examination is a conviction that the *members of the American confederacy only are the states contemplated in the constitution. . . . [T]he word state is used in the constitution as designating a member of the union*, and excludes from the term the signification attached to it by writers on the law of nations.

*Hepburn & Dundas v. Ellzey*, 6 U.S. 445, 452-53 (1805) (emphasis added); *see also De Geofroy v. Riggs*, 133 U.S. 258, 269 (1890). In fact, the Constitution uses "State" or "States" 119 times apart from the Second Amendment and in 116 of the

---

bearing arms, so as to deprive the United States of their rightful resource for maintaining the public security, and disable the people from performing their duty to the general government.

*Id.* at 584.

119, the term unambiguously refers to the States of the Union.[9] U.S. Const., *passim.* Accepted statutory construction directs that we give "State" the same meaning throughout the Constitution. *Cf. Sorenson v. Sec'y of the Treasury*, 475 U.S. 851, 860 (1986) ("The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning." (internal quotations omitted)).[10]

---

[9]In three instances the Constitution refers to a "foreign State," *see* U.S. Const. Art. I, § 9, cl. 8; *id.* Art. III, § 2, cl. 1; *id.* amend. XI. "State" with a plainly different meaning also appears in reference to the President's "State of the Union." *Id.* Art. II, § 3, cl. 1. The Constitution refers to "a" State five times. *See id.* Art. III, § 2, cls. 1, 2; *id.* amend. XXIII, § 1, cl. 2. A descriptive adjective precedes "State" two times. *See id.* Art. IV, § 3, cl. 1 ("no new State"); *id.* amend. XXIII, § 1, cl. 2 ("the least populous State").

[10]The legislative history of the Second Amendment also supports the interpretation of "State" as one of the States of the Union. In the First Congress, James Madison proposed language that a well-regulated militia was "the best security of a free *country*." David Yassky, *The Second Amendment: Structure, History, and Constitutional Change*, 99 Mich. L. Rev. 588, 610 (2000) (citing Creating the Bill of Rights: The Documentary Record from the First Federal Congress 12 (Helen E. Veit, Kenneth R. Bowling & Charlene Bangs Bickford eds., 1991) (Documentary Record)) (emphasis added). After the proposal was submitted to an eleven-member House of Representatives committee (including Madison), however, "country" was changed to "State." *Id.* (citing Documentary Record, *supra*, at 30). As Judge Walton noted:

Anti-Federalist Elbridge Gerry explained that changing the language to "necessary to the security of a free State" emphasized the primacy of the state militia over the federal standing army: "A well-regulated militia being the best security of a free state, admitted an idea that a standing army was a secondary one."

Although "the Constitution is in effect . . . in the District," *O'Donoghue v. United States*, 289 U.S. 516, 541 (1933) , as it is in the States, "[a] citizen of the district of Columbia is not a citizen of a *state* within the meaning of the constitution." *Hepburn*, 6 U.S. at 445 (emphasis in original). Accordingly, both the Supreme Court and this court have consistently held that several constitutional provisions explicitly referring to citizens of "States" do not apply to citizens of the District. *See id.* at 452-53; *see also Bolling v. Sharpe*, 347 U.S. 497, 498-99 (1954) (District not "State" under Fourteenth Amendment); *Adams v. Clinton*, 531 U.S. 941 (2000), *aff'g* 90 F. Supp. 2d 35 (D.D.C. 2000) (three-judge district court held that Constitution does not guarantee District citizens right to vote for members of Congress because District does not constitute "State" within Constitution's voting clauses[11]); *LaShawn v. Barry*, 87 F.3d 1389, 1394 n.4 (D.C. Cir. 1996) ("The District of Columbia is not a state. It is the seat of our national government . . . . Thus, [the Eleventh Amendment] has no application here."); *Lee v. Flintkote Co.*, 593 F.2d 1275, 1278 n.14 (D.C. Cir. 1979) ("[T]he District, unlike the states, has no reserved power to be guaranteed by the Tenth Amendment."). On the other hand, the Supreme Court and this court have held that the District can

---

*Seegars*, 297 F. Supp. 2d at 229 (internal quotation omitted) (citing Yassky, *supra* (quoting The Congressional Register, August 17, 1789)). Indeed, in light of the meaning of "State" as used throughout the Constitution, *see supra* p. 5, and the care the drafters are presumed to have taken in selecting specific language, *see Holmes v. Jennison*, 39 U.S. 540, 570-71 (1840) ("Every word [in the Constitution] appears to have been weighed with the utmost deliberation, and its force and effect to have been fully understood."), the change plainly suggests that the drafters intended to clarify that the right established in the Second Amendment was intended to protect the "free[dom]" of the "State[s]" of the Union rather than the "country."

[11]U.S. Const. Art. I, §§ 2-4.

parallel a "State" within the meaning of some constitutional provisions. *Loughran v. Loughran*, 292 U.S. 216, 228 (1934) (Full Faith and Credit Clause binds "courts of the District . . . equally with courts of the states"); *Milton S. Kronheim & Co. v. District of Columbia*, 91 F.3d 193, 198-99 (D.C. Cir. 1996) (while "D.C. is not a state," Commerce Clause and Twenty-first Amendment apply to District). Ultimately, "[w]hether the District of Columbia constitutes a 'State or Territory' within the meaning of any particular statutory or *constitutional provision* depends upon the character and aim of the specific provision involved." *District of Columbia v. Carter*, 409 U.S. 418, 419-20 (1973) (emphasis added).

The Second Amendment's "character and aim" does not require that we treat the District as a State. The Amendment was drafted in response to the perceived threat to the "free[dom]" of the "State[s]" posed by a national standing army controlled by the federal government. *See, e.g.*, *Emerson*, 270 F.3d at 237-40, 259; *Silveira*, 312 F.3d at 1076. In *Miller*, the Supreme Court explained that "[t]he sentiment of the time [of the Amendment's drafting] strongly disfavored standing armies; the common view was that adequate defense of country and laws could be secured through the Militia" composed of men who "were expected to appear bearing arms supplied by themselves." 307 U.S. at 179. Indeed, at the time of the Constitutional Convention, "there was a widespread fear that a national standing Army posed an intolerable threat to individual liberty and to the *sovereignty of the separate States*." *Perpich v. Dep't of Defense*, 496 U.S. 334, 340 (1990) (emphasis added). The Second Amendment, then, "aimed" to secure a military balance of power between the States on the one hand and the federal

government on the other.[12]   Unlike the States, the District had—and has—no need to protect itself from the federal government because it is a *federal* entity created as the seat of that government.

> [T]he Second Amendment was included in the Bill of Rights to ensure that the people would have the ability to defend themselves against a potentially oppressive federal government, which had just been given the authority to maintain a national standing army in Article I of the Constitution.   But, the drafters of the Constitution having provided for a 'District . . . [to]

---

[12]As noted in *Seegars*:

[I]n his efforts to convince the people of the advantages of the Constitution in The Federalist Papers, James Madison noted that although the federal government had a standing army, the people would have the use of militias, stating:

> Let a regular army, fully equal to the resources of the country, be formed; and let it be entirely at the devotion of the federal government: still it would not be going too far to say that the State governments with the people on their side would be able to repel the danger. . . . Besides the advantage of being armed, which the Americans possess over the people of almost every other nation, the existence of subordinate governments, to which the people are attached and by which the militia officers are appointed, forms a barrier against the enterprises of ambition, more insurmountable than any which a simple government of any form can admit of.

*Seegars*, 297 F. Supp. 2d at 235 (internal quotation omitted) (quoting *The Federalist* No. 46, at 267 (Clinton Rossiter ed., 1961)).

13

become the Seat of the Government of the United States,' and having given Congress 'exclusive' authority both to legislate over this District *and to exercise control over 'the Erection of Forts, Magazines, [and] Arsenals . . . ,'* surely it was not intended for the protection afforded by the Second Amendment to apply to an entity that had been created to house the national seat of government. In other words, there is no reason to believe that the First Congress thought that the federal seat of government needed to be protected from itself when the Second Amendment was adopted.

*Seegars*, 297 F. Supp. 2d at 238-39 (internal citations omitted) (emphasis and alterations in original);[13] *see also Sandidge v.*

---

[13]Even if the District were to be considered a "State" under the Second Amendment, I do not believe D.C. Code § 7-2502.02(a)(4) could be challenged thereunder. When adopted, the Bill of Rights protected individuals only against the federal government. *See, e.g.*, *Barron v. City of Baltimore*, 32 U.S. 243, 247 (1833). Under the "incorporation" doctrine, however, "many of the rights guaranteed by the first eight Amendments to the Constitution have been held [by the Supreme Court] to be protected against state action by the Due Process Clause of the Fourteenth Amendment." *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968) (Sixth Amendment right to jury trial in criminal case protected against state action); *see also Benton v. Maryland*, 395 U.S. 784, 795 (1969) ("Once it is decided that a particular Bill of Rights guarantee is fundamental to the American scheme of justice, the same constitutional standards apply against both the State and Federal Governments." (internal quotation and citation omitted)). But the Supreme Court has never held that the Second Amendment has been incorporated. *Cf. United States v. Cruikshank*, 92 U.S. 542, 553 (1875) ("[The Second Amendment] is one of the amendments that has no other effect than to restrict the powers of the national government . . . ."); *see also Love*, 47 F.3d at 123 ("The Second Amendment does

*United States*, 520 A.2d 1057, 1058 (D.C. 1987) ("assuming the second amendment applies to the District of Columbia," majority holds "the Second Amendment guarantees a collective rather than an individual right" (internal quotation omitted)); *see also id.* at 1059 (Nebeker, J., concurring) ("I conclude first that [the Second Amendment] does not apply to the Seat of the Government of the United States.").

### III.

In its origin and operation, moreover, the District is plainly not a "State" of the Union. It is, instead, "an exceptional community," *District of Columbia v. Murphy*, 314 U.S. 441, 452 (1941), that "[u]nlike either the States or Territories, . . . is truly sui generis in our governmental structure." *Carter*, 409 U.S. at

---

not apply to the states." (citing *Cruikshank*, 92 U.S. 542)); *Cases*, 131 F.2d at 921-22 ("Whatever rights . . . the people may have [under the Second Amendment] depend upon local legislation; the only function of the Second Amendment being to prevent the federal government and the federal government only from infringing that right." (citing *Cruikshank*, 92 U.S. at 553)). Thus, the Amendment does not apply to gun laws enacted by the States. Because the Second Amendment "was specifically included by the drafters of the Bill of Rights to protect the states against a potentially oppressive federal government," *Seegars*, 297 F. Supp. 2d at 230, it would make little sense to incorporate the Amendment. Although the District is a *federal* enclave and thus the Second Amendment might seem to apply without regard to incorporation, to hold that the District constitutes a "State" under the Amendment and yet, at the same time, to treat its laws as federal is a self-contradiction. In other words, either the District, as a federal enclave, enacts federal law, including D.C. Code § 7-2502.02(a)(4), or the District is a "State" and D.C. Code § 7-2502.02(a)(4) is state legislation to which the unincorporated Second Amendment does not apply.

432.  The Constitution provides for the creation of the District in Article I, granting the Congress the power "[t]o exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States."  U.S. Const. Art. I, § 8, cl. 17.  As the Supreme Court explained in *O'Donoghue*, "The object of the grant of exclusive legislation over the district was . . . national in the highest sense, and the city organized under the grant became the city, not of a state, not of a district, but of a nation."  289 U.S. at 539-40 (internal quotations and citations omitted).   In other words, the District is "the capital—the very heart—of the Union itself . . . within which the immense powers of the general government were destined to be exercised for the great and expanding population of forty-eight states."  *Id.* at 539.

The Congress possesses plenary power over the District and its officers.  *Id.*  "Indeed, '[t]he power of Congress over the District of Columbia includes all the legislative powers which a state may exercise over its affairs.'"  *Carter*, 409 U.S. at 429 (quoting *Berman v. Parker*, 348 U.S. 26, 31 (1954)).  Although the Congress delegated certain authority to the District's local government in the Home Rule Act of 1973, D.C. Code §§ 1-201.01 *et seq.*, it reserved the authority to enact legislation "on any subject," D.C. Code § 1-206.01, and to repeal legislation enacted by the local government, *id.* § 1-206.02(c)(1).  *See Bliley v. Kelly*, 23 F.3d 507, 508 (D.C. Cir. 1994) (describing Home Rule Act).

As do the States, the District maintains a "militia" of "[e]very able-bodied male citizen . . . of the age 18 years and under the age of 45 years " residing in the District, D.C. Code § 49-401, which includes an "organized" division  that is

"designated the National Guard of the District of Columbia," D.C. Code § 49-406. Nevertheless, the District is again unique in that its militia "is essentially a component of the federal government." *Seegars*, 297 F. Supp. 2d at 241. That is, it is controlled by the federal government and acts only on the order of the President.[14] Executive Order 11,485 authorizes the Secretary of the United States Department of Defense to "supervise, administer and control" the District's National Guard "while in militia status" and to "order out the National Guard . . . to aid the civil authorities of the District of Columbia." Exec. Order No. 11,485, 34 Fed. Reg. 15,411 § 1 (Oct. 1, 1969). The Executive Order also provides that the "Commanding General and the Adjutant General of the National Guard will be appointed by the President," *id.* § 3, and that the Commanding General "shall report to the Secretary of Defense," *id.* § 1; *see also* D.C. Code § 49-301(a)-(b) ("There shall be appointed and commissioned by the President of the United States a Commanding General of the militia of the District of Columbia . . . . [T]he Commanding General of the militia of the District of Columbia shall be considered to be an employee of the Department of Defense."). Unlike a State Governor who can

---

[14]"The President of the United States shall be the Commander-in-Chief of the *militia* of the District of Columbia." D.C. Code § 49-409 (emphasis added); *see also id.* § 49-404 ("The enrolled militia shall not be subject to any duty except when called into the service of the United States, or to aid the civil authorities in the execution of the laws or suppression of riots."); *id.* § 49-405 ("Whenever it shall be necessary to call out any portion of the enrolled militia the Commander-in-Chief shall order out, by draft or otherwise, or accept as volunteers as many as required.").

mobilize the State militia during civil unrest,[15] the Mayor of the District must request the President to mobilize the District's militia. D.C. Code § 49-103 ("[I]t shall be lawful for the Mayor of the District of Columbia . . . to call on the Commander-in-Chief to aid . . . in suppressing . . . violence and enforcing the laws; the Commander-in-Chief shall thereupon order out so much and such portion of the militia as he may deem necessary to suppress the same . . . ."). *See generally Seegars*, 297 F. Supp. 2d at 240-41 (discussing structure of District's militia).

To sum up, there is no dispute that the Constitution, case law and applicable statutes all establish that the District is not a State within the meaning of the Second Amendment. Under *United States v. Miller*, 307 U.S. at 178, the Second Amendment's declaration and guarantee that "the right of the people to keep and bear Arms, shall not be infringed" relates to the Militia of the States only. That the Second Amendment does not apply to the District, then, is, to me, an unavoidable conclusion.

For the foregoing reasons, I would affirm the district court's dismissal of Heller's Second Amendment challenge to section 7-2502.02(a)(4) for failure to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6). I would affirm its dismissal of the other five appellants' claims as well as Heller's other claims for lack of standing under Federal Rule of Civil Procedure 12(b)(1). Accordingly, I respectfully dissent.

---

[15]*See, e.g.*, 4 Pa. Code § 7.211(a) ("The *Governor* will retain command of State peacekeeping forces during a civil disorder.") (emphasis added), (d) ("In the event of disorder, . . . [w]eapons carried by the National Guard will not be loaded nor will bayonets be fixed without the specific order of the *Governor*.") (emphasis added).